Argued and submitted October 12, 2016, affirmed May 24; M. D. P.'s petition for review denied August 24 (361 Or 803), K. A. H.'s petition for review denied September 14, 2017 (361 Or 885)

In the Matter of R. R. P.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. D. P.
and K. A. H.,
*Appellants.*

Lane County Circuit Court
14451J;
Petition Number 14451J01;
A161971 (Control)

In the Matter of M. R. P., Jr.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. D. P.
and K. A. H.,
*Appellants.*

Lane County Circuit Court
14452J;
Petition Number 14452J01;
A161972

397 P3d 582

Ginger Fitch argued the cause and filed the brief for appellant K. A. H.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Amelia Andersen, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant M. D. P.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jonathan N. Schildt, Assistant Attorney General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

## DUNCAN, P. J.

In these consolidated juvenile dependency cases, parents appeal the juvenile court's judgments that changed the permanency plans for their two children, R and M, from reunification to guardianship. Parents assert that the juvenile court erred in concluding that, despite the Department of Human Services' (DHS) reasonable efforts to effect reunification, parents had not made sufficient progress for the children to safely return home. We affirm.

Parents do not request that we exercise our discretion to review this case *de novo*, and we find no reason to do so. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Thus, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the [juvenile] court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013); *Dept. of Human Services v. G. N.*, 263 Or App 287, 294, 328 P3d 728, *rev den*, 356 Or 638 (2014) (whether a parent's progress was sufficient is a legal conclusion that we review for errors of law).

We begin with a brief history of DHS's involvement with the family. In October 2014, the juvenile court took jurisdiction over the children based on parents' admissions that their "chaotic lifestyle and residential instability interfere with [their] ability to safely parent[,]" that father had "exposed the [children] to domestic discord[,]" and that mother "was subjected to domestic discord" by father and was "unable or unwilling to protect the [children] from exposure to father's discord." The children were placed in relative foster care with their paternal grandmother (grandmother).

The juvenile court ordered parents to (1) complete domestic violence counseling and demonstrate a "violence-free lifestyle"; (2) complete a psychological evaluation and follow the service recommendations from their evaluators;

(3) complete a parent training program and demonstrate skills learned in the program; and (4) maintain safe and stable housing.

Between October 2014 and the summer of 2015, parents moved between residences. Initially, parents moved from Florence to Roseburg. There, DHS connected parents with counseling services and asked them to initiate parent training. However, before parents were able to engage in any services in Roseburg, in January 2015, they moved back to Florence. In Florence, parents began to engage in services, such as domestic violence education and parenting classes, but made little progress and did not complete those programs.

Mother participated in a psychological evaluation with Dr. Sorensen in February 2015. Dr. Sorenson recommended that mother complete domestic violence services, counseling, and substance abuse treatment. Later in February 2015, mother began outpatient drug and alcohol treatment, but tested positive for marijuana during that treatment. In June 2015, mother gave birth to a healthy daughter, J, and, in July 2015, moved with the infant to a residential drug and alcohol program in Baker City.

Father was arrested for second-degree assault in February 2015 for throwing an ashtray at a roommate, and in March 2015, he was convicted of unlawful use of a weapon and sentenced to probation. Father admitted to his probation officer that he had been using methamphetamine. In June 2015, on his probation officer's referral, father began a six-month residential drug and alcohol program in Portland.

In October 2015, the juvenile court conducted a permanency hearing in accordance with ORS 419B.470.[1] At that hearing, the court granted parents a 120-day extension,

---

[1] ORS 419B.470 provides, in part:

"(2) [Except as provided in subsection (1) of this section,] in all * * * cases when a child or ward is in substitute care, the court shall conduct a permanency hearing no later than 12 months after the ward was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child or ward was placed in substitute care, whichever is earlier."

pursuant to ORS 419B.476(4)(c),[2] to allow them to engage in necessary services. The court again ordered parents to complete domestic violence counseling and parent training and to maintain safe and stable housing. The court also ordered additional requirements of parents, including that father complete his psychological evaluation, and that both parents follow through with their evaluator's recommendations.

In November 2015, father participated in a psychological evaluation with Dr. Basham, who recommended that father complete substance abuse treatment and then engage in a batterer's intervention program. In December 2015, father completed residential substance abuse treatment, as well as anger management and parenting courses, and moved back to Florence. Also in December 2015, mother left the Baker City treatment program a month early and against clinical recommendation, to reunite with father in Florence. In Florence, parents began outpatient drug and alcohol treatment, individual counseling, domestic violence training and counseling, and parenting classes. Parents also began weekly visits with the children in December 2015 and began working with a parenting trainer, who supervised those visits, starting in January 2016.

The court held a second permanency hearing in March 2016. DHS requested that the children's plan be changed from reunification to guardianship, and the children's Court Appointed Special Advocate (CASA) and the children's attorney supported that change. Parents opposed a change in plan to guardianship.

At the time of the hearing, parents had completed or were engaged in all of their court-ordered services. They were employed and were moving into two sublet bedrooms in a house. They had been co-parenting J for two months.

---

[2] ORS 419B.476(4) provides, in part:

"At a permanency hearing the court may:

"* * * * *

"(c) If the court determines that further efforts will make it possible for the ward to safely return home within a reasonable time, order that the parents participate in specific services for a specific period of time and make specific progress within that period of time[.]"

As for the children, at the time of the hearing, R was five years old and M was two years old. They had been in grandmother's care for 18 months. When R first came into her grandmother's care, she appeared more like a "little adult" than a four-year-old child and exhibited "parentified" behaviors toward M. R began weekly counseling sessions in November 2014. In a letter dated February 10, 2016, R's therapist observed:

> "Over the course of treatment with [R], I have observed her go through many ups and downs with regard to her ability to manage her anxiety in response to contact with her biological parents and ability to discuss feelings and thoughts related to returning home with them. [R] does best when she has consistent contact with or without them and she is not given mixed messages about what is going to happen to her. She holds on to a lot of worry thoughts about her parents, but it is also evident that she loves them and wants to be with them."

A DHS case plan dated January 19, 2016, described R as "bright, healthy, cheerful, sociable and proud[,]" and noted that she was "thriving at Head Start" and "is developing normally." When M came into grandmother's care, he had "essentially no muscle tone." However, by February 2016, grandmother reported that M was very strong and healthy and had begun speaking. M was also developing normally.

After the hearing, the juvenile court entered a judgment changing the permanency plan from reunification to guardianship. The court also ordered parents to continue to participate in services, again requiring both parents to follow the recommendations from their comprehensive psychological evaluations; complete domestic violence counseling and parenting training; maintain regular contact with the DHS caseworker; and maintain safe and stable housing as approved by DHS. Parents appeal that judgment.

Changes to permanency plans are governed by ORS 419B.476. As relevant here, ORS 419B.476(2)(a) provides:

> "If the case plan at the time of the hearing is to reunify the family, [the juvenile court shall] determine whether [DHS] has made reasonable efforts * * * to make it possible for the

ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

Thus, under ORS 419B.476(2)(a), to change a child's permanency plan away from reunification, the proponent of the change must prove by a preponderance of the evidence both "that (1) [DHS] made reasonable efforts to make it possible for the child to be reunified with his or her parent and (2) notwithstanding those efforts, the parent's progress was insufficient to make reunification possible." *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017). Parents do not challenge the juvenile court's "reasonable efforts" conclusion, but contend that the preponderance of the evidence does not support the juvenile court's conclusion that their progress was insufficient.

Parents argue that the juvenile court erred in determining that they had not made sufficient progress for the children to be returned to their care. According to parents, the trial court erred because their participation in all of the required programs and their efforts to maintain sobriety and obtain employment and housing conclusively establish that they had made sufficient progress. Mother also asserts that parents' success in caring for an infant without state intervention should be conclusive evidence that they made sufficient progress in ameliorating the concerns underlying the jurisdictional bases.

We acknowledge that, between the October 2015 and March 2016 permanency hearings, parents engaged in a number of services and made some meaningful progress. By the time of the permanency hearing, parents were engaged in all of the services that DHS and the juvenile court had required of them. However, as we explained in *Dept. of Human Services v. S. J. M.*, 283 Or App 367, 382, 388 P3d 417, *rev allowed*, 361 Or 350 (2017), "it is not dispositive that a parent has satisfied DHS's expectations by participating in services; what matters under ORS 419B.476(2)(a) is whether the parent has made sufficient progress, as a result of those services or otherwise, to overcome the

concerns that gave rise to juvenile court jurisdiction." *See Dept. of Human Services v. N. S.*, 246 Or App 341, 351, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012) ("[M]ere participation in services * * * is not sufficient to establish adequate progress toward reunification." (Internal quotation marks omitted.)). Here, the juvenile court determined that parents had not made sufficient progress to alleviate the concerns that the children had been exposed to "domestic discord" in parents' relationship and that parents' "chaotic lifestyle" and "residential instability" interfered with their abilities to safely parent the children.

Despite evidence that parents had participated in domestic violence programs for a few months, we conclude that the record contains legally sufficient evidence to support the juvenile court's conclusion that parents had not made sufficient progress for reunification because they had not remediated the risks of harm from their domestic discord and residential instability at the time of the permanency hearing.

First, regarding the domestic discord, mother had not followed the order that she comply with the recommendations from her psychological evaluation, which related to her ability to protect the children. In February 2015, Dr. Sorensen observed that mother displayed "a tremendous lack of empathy" for her children when discussing allegations that father had been physically and verbally abusive to her and the children. Dr. Sorensen also observed that mother displayed traits "consistent with the antisocial personality features of a personality disorder," including a "lack of emotional attachment to her children" and "difficulty accepting that [her substance abuse] problems affected her children or were worthy of ongoing concern." Dr. Sorensen opined that these traits could change, "if attributable to substance abuse or emotional distress[,]" and therefore considered substance abuse treatment "essential" to mother's ability to safely parent the children. He suggested that mother's treatment team should focus "on observation of her efforts and successes to verify that she is in fact working towards progress and not simply providing others what they require before backing off demands."

However, as of the March 2016 permanency hearing, mother had not completed any substance abuse program and, as mentioned above, left the residential treatment program in Baker City against clinical recommendations. Although we acknowledge that mother has been sober for over six months, there is evidence that she has not made progress on the barriers that Dr. Sorensen identified in February 2015. In a letter dated December 15, 2015, mother's counselor at the treatment program explained that, during her treatment there, mother

"demonstrated a lack of engagement, of self-awareness, of honest disclosure, of comprehension and quite possibly a lack of desire to really follow through with some of the coping skills and strategies necessary to remain clean and sober and to actually be able to make decisions in the best interest of her children."

The letter also stated that, up until the day that she left the treatment program, mother denied that she had plans to leave treatment early. The letter asserted that "this demonstrates that [mother] is able to easily dismiss the truth and tell people what she thinks they want to hear" and that "she is not able or willing to make decisions based upon what is most beneficial to her children."

Similarly, father had failed to comply with the recommendations from his psychological evaluation, which revealed that he was "at a clear risk for domestic violence." Dr. Basham acknowledged that father "seems to be making genuine progress addressing his longstanding drug dependency" and that "[s]uccessful abstinence from drugs and alcohol will substantially improve his prospects for future functioning and general life stability." However, Dr. Basham asserted that father's "abusive behavior is a problem separate from drug dependency, and requires its own treatment." As mentioned, father has not yet completed any domestic violence counseling or treatment program.

The record also shows that parents continued to experience residential instability at the time of the permanency hearing. Throughout the case, parents engaged in a pattern of frequent and sudden moves between residences. Although parents had housing at the time of the permanency

hearing, they had not demonstrated an ability to maintain stable housing.

Finally, although we acknowledge that parents' ability to care for an infant demonstrates that they have made considerable efforts to improve their relationship and living situation, we disagree that the presence of an infant in their care "is determinative of whether the other children can be safely returned." The "sufficient progress" inquiry is "explicitly centered on whether the *ward* may safely return home, and * * * the court must make [that] determination[] with the 'ward's health and safety [as] the paramount concerns.'" *Dept. of Human Services v. J. B. V.*, 262 Or App 745, 755, 327 P3d 564 (2014) (quoting ORS 419B.476(2)(a); emphasis in original).

At the permanency hearing, the children's CASA expressed concern that, despite parents' substantial progress with the parenting trainer, they did not yet have the skills to provide a stable environment for three children. The children's attorney also expressed concern that "putting two new children into that situation could bring instability for everyone." In the letter dated February 29, 2016, the family's parenting trainer described the progress that parents had made over the course of the four visits that she had supervised. She explained:

> "At the beginning, the visit was disorganized and inconsistent. The children were scattered and the parents were not coming together to follow through on anything. Both parents were passive and then aggressive telling the children 'No' repeatedly. * * * During the first and second visit, there were times when [J] was left unattended for short amounts of times. I gave them feedback and a schedule to follow and the last three visits have shifted. * * * They are working on how they talk to the children and trying really hard to be positive with them and follow through."

However, she also asserted:

> "Although the parents have made some progress on their parenting in their one hour visit once a week, it will take some time to make significant changes in the way they parent their children. I will need to see them in visits for longer periods of time to see the way they follow through and

stay on schedule and the reaction of the children to actually being parented by their parents and not simply visiting. With children that have experienced chaos with their parents before, this could take a significant amount of time."

In sum, there is sufficient evidence in the record to support the juvenile court's conclusion that the parents had not made sufficient progress for reunification at the time of the permanency hearing. Although parents had engaged in services and made progress, each parent had yet to successfully complete specifically ordered programs that were intended to address their ability to care for and protect the children. Likewise, although parents had secured housing at the time of the permanency hearing and were improving their parenting during their visits with the children, given the family's history and the assessments of those who observed and evaluated them, additional stability and improvements were necessary for reunification.

Affirmed.