Argued and submitted November 16, 2011, reversed and remanded
January 25, 2012

In the Matter of
M. T., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

N. T.
and M. T.,
*Appellants.*

Lane County Circuit Court
10244J;
Petition Number 10244J01;
A148730 (Control)

In the Matter of
M. T., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

N. T.
and M. T.,
*Appellants.*

Lane County Circuit Court
10245J;
Petition Number 10245J01;
A148731

271 P3d 143

Margaret McWilliams argued the cause and filed the brief for appellant N. T.

Megan L. Jacquot argued the cause and filed the brief for appellant M. T.

Justice J. Rillera, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Walters, Judge pro tempore.

DUNCAN, J.

**DUNCAN, J.**

Mother and father appeal from juvenile court judgments changing the permanency plans for their two children, "Mu" and "Me," from reunification to adoption. They each contend that the court erred in (1) concluding that the Department of Human Services (DHS) had made reasonable efforts to reunify the family; (2) concluding that mother had not made sufficient progress to enable the children to return home;[1] and (3) relying on facts "extrinsic to the jurisdictional judgment" in changing the plans. In addition, mother asserts that the court erred in denying her request for a 60-day extension of time "in which to complete additional rehabilitative services." We conclude that the juvenile court erred in relying on facts outside the scope of the jurisdictional judgment—specifically, facts relating to the alleged sexual abuse of Mu by father—in assessing whether a change in plan was warranted under ORS 419B.476(2)(a). Because we cannot tell whether, properly focused, the court would have reached the same conclusions as to DHS's efforts and parents' progress toward reunification, the error was not harmless. Accordingly, we reverse and remand on that basis and do not reach parents' other arguments.

The parties acknowledge that *de novo* review is not appropriate in this case, and we agree. *See* ORS 19.415(3)(b) (providing for discretionary *de novo* review of certain equitable actions); ORAP 5.40(8)(d) (setting forth nonexclusive list of factors governing exercise of *de novo* review under ORS 19.415(3)(b)). Accordingly, we review the juvenile court's legal conclusions for legal error, and we are bound by the court's findings of historical fact as long as there is any evidence to support them. *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). We state the facts consistently with that standard.

Mother and father have been together since 2002. They have two children: Mu, born in 2005; and Me, born in 2008. The incident that precipitated the children's removal from parents' care occurred around March 13, 2010.[2] On that

---

[1] Father does not appear to contend on appeal that *he* had made sufficient progress to make it possible for the children to return home, only that mother had.

[2] There were three previous reports to DHS regarding the family, two in 2007 and one in 2009. It appears that no action was taken regarding those reports because DHS, in each instance, was unable to locate the family.

day, mother and father began arguing while they were driving down the freeway; Mu was in the car with them. Mother hit father while he was driving, pulled the car out of gear, and, after it stopped, got out and tried to walk into traffic. The police were called, and mother admitted that she had taken 15 or more Lorazepam tablets an hour earlier.[3] The police arrested father on an active warrant, and mother was hospitalized overnight in a mental health unit.

DHS filed dependency petitions with respect to both children, alleging various circumstances and conditions endangering their welfare, including the parents' history of domestic violence, substance abuse, and housing and employment instability. *See* ORS 419B.100(1)(c) (establishing juvenile court jurisdiction with respect to a child "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others"). The petitions, filed in early April, also alleged that mother had a mental or emotional condition that interfered with her ability to parent the children. Ultimately, however, the juvenile court established jurisdiction over the children on the basis of parents' more narrow admissions. Specifically, jurisdiction with respect to mother was predicated on her admission that,

> "on or about March 13, 2010, she took 15 or more Lorazepam tablets and was behaving erratically while the child was in her care. Mother needs the assistance of a child caring agency to provide for her child's physical, emotional and mental well-being and is willing to participate in a psychological evaluation, counseling, parenting class and drug and alcohol evaluation, if requested by DHS, and follow recommendations thereof."

(Boldface omitted.) Jurisdiction as to father was based on his admissions to the allegations contained in paragraphs 4B and 4C of the petition—in short, that the couple's use of alcohol and/or controlled substances (paragraph 4B), as well as their "chronic living instability, employment instability and chaotic lifestyle" (paragraph 4C), interfere with their ability to parent—as well as on the following: "Father admits to past physical disputes with mother that could present a threat of

---

[3] Lorazepam is a benzodiazepine drug used to treat anxiety disorders. *Physicians' Desk Reference* 3271 (53rd ed 1999).

harm. Father agrees to under[go] a psychological evaluation, if requested, and follow all recommendations." The jurisdictional judgments, entered on June 10, 2010, ordered mother and father to complete drug and alcohol and psychological evaluations and follow the resulting treatment recommendations, submit to urinalyses as requested, complete domestic violence counseling, maintain safe and stable housing, and demonstrate a drug-free and violence-free lifestyle.[4]

The children were initially placed with their maternal grandmother; approximately one month before the permanency hearing at issue in this case, they were moved to their maternal grandfather and his wife. Very early in the pendency of the case—indeed, before the jurisdictional judgments were entered—DHS learned that Mu had made disclosures of sexual abuse involving father. On August 6, 2010, Mu's treating psychologist, Dr. Gizara, "strongly recommend[ed]" that parental visits be discontinued "[b]ased upon the severity of her behavioral/emotional problems (including sexual reactivity), as well as her explicit disclosure to me of sexual activity with both of her parents."[5]

On August 25, 2010, at the request of DHS, Dr. Heskett, a physician, evaluated Mu for possible physical abuse. In response to questioning by Heskett, Mu indicated that she was touched on her private parts by several persons, including mother, father, and her grandparents, and that she sometimes touched her parents' private parts. Heskett reported that Mu exhibited significant sexualized behavior, including "frequent masturbatory activity" and inappropriately touching others. A physical examination revealed no abnormalities. Heskett assessed Mu with child sexual abuse, stating that the "[e]xact nature of sexual contact and extent of the abuse is unclear to me at this time."

---

[4] It is apparent from action agreements entered into between DHS and parents in March 2011 that the required domestic violence counseling included couples counseling.

[5] Visits between Mu and father were stopped, and that status continued at the time of the permanency hearing. It is not clear from the record if visits with mother were suspended, but, at least at the time of the hearing, supervised visitation between mother and both children was occurring on a regular basis. Additionally, the record reflects that father regularly had supervised visits with Me.

In December, DHS referred Mu to Dr. Scott, a psychologist, for a comprehensive psychological evaluation. Scott expressed concerns about the way in which Heskett's evaluation had been done, noting that it "may have been inappropriate for this type of assessment and could contaminate the interview." His report also indicated that Mu's counselor was concerned that "[Mu]'s self-report may have been contaminated by coaching by the grandmother." Nonetheless, Scott opined that Mu "is an emotionally disturbed young child who likely has experienced significant sexual abuse as well as substantial neglect" and that, "[i]n regards to diagnoses, [Mu] appears to meet the criteria for sexual abuse of child based on her history."

DHS eventually made a "founded" disposition regarding the allegations of sexual abuse involving Mu.[6] Father's attorney requested that DHS file a new or amended petition incorporating those allegations; however, DHS did not do so, and no services were provided to parents to address concerns raised by the allegations. The DHS caseworker assigned to the case testified at the permanency hearing that case planning for the family, in particular with respect to visitation, was driven by the sexual abuse allegations.

A permanency hearing was held on April 21, 2011, after the children had been in foster care for approximately one year. At that time, DHS requested that the court change the plans for the children to adoption, arguing that parents had not made sufficient progress to make it possible for the children to return to their care in a reasonable time. Father and mother challenged DHS's use of information about Mu's sexual abuse disclosures (detailed in its case plan), arguing that

> "that has not been pled or adjudicated in the Court, and there are no services around this, yet it continues to be a recurring theme in the case that's unable to be reached by the parents because it's just not part of the jurisdictional basis."

---

[6] The exact nature and timing of DHS's disposition does not appear in the record.

Following the hearing, the juvenile court entered judgments finding that DHS had made reasonable efforts to make it possible for the children to return home, but that mother and father had not made sufficient progress to make it possible for the children to safely return home. Specifically, with regard to Mu, the court made the following findings:

"Giving paramount consideration to the child's health, safety and welfare, the child's mother has not made sufficient progress to make it possible for the child to safely return home. Mother has a history of substance abuse, including prescription drug abuse. Mother has recently tested positive for alcohol. She continues to reside with the child's father who has his own history of substance abuse and continuing use. Dr. Basham indicated in his report[,] following the psychological examination, that mother's mental health issues could not be dealt with until she has ended drug use. Furthermore, her housing instability and transportation difficulties have made it difficult to participate in services. Finally, her use of substances appears to be enmeshed with father's use, making it difficult for either of them to overcome their substance abuse.

"Giving paramount consideration to the child's health, safety and welfare, the child's father has not made sufficient progress to make it possible for the child to safely return home. Father has a history of substance abuse and has continued to give positive UAs. Father has significant mental health needs which have resulted in self-referrals for emergency mental health treatment. According to Dr. Basham, it is difficult to determine if father's current mental health difficulties are a side-effect of chronic marijuana use. Given his long, reported, daily use of marijuana, it is unlikely that father can succeed in outpatient treatment. Based upon the recommendation of the child's therapist, the father is having no visits with the child.

"The child demonstrates severe sexualized reactivity and requires an exceptionally high level of supervision as well as treatment. She presents as an emotionally disturbed child who likely [h]as experienced significant sexual abuse as well as substantial neglect. Based upon her disclosures to her prior therapist and her current therapist, the child is having supervised visits with her mother and no visits at all with her father. She has been assessed to have experienced sex abuse, the exact nature and extent are

undetermined. Even if the child's verbal disclosures are discounted, the child exhibits behaviors which point to sexual abuse and her sexual reactivity requires specialized treatment and supervision.

> *"Given the barriers to father's reunification with the child, the child's unique needs, and the fact that parents present as a couple, mother's ability to parent the child within a reasonable time is extremely problematic."*

(Emphasis added; record citations omitted.) The court made essentially identical findings with respect to Me, except, rather than the findings set out in the final two paragraphs quoted above, the court found:

> "The child's 5-year-old sister presents as an emotionally disturbed child who likely [h]as experienced significant sexual abuse as well as substantial neglect. *Given the barriers to father's reunification with this child, the even more substantial barriers to reunification with child's sibling, and the fact that the child's parents present as a couple, mother's ability to parent the child within a reasonable time is extremely problematic."*[7]

(Emphasis added; record citations omitted.) With respect to both children, the court then continued, "It is necessary to continue the child in substitute care because she cannot be safely returned to her parents at this time." Based on those findings, the court ordered adoption as the permanency plan for the children and required that they be placed for adoption and a petition for termination of parental rights be filed within 60 days.

On appeal, as noted, parents contend, *inter alia*, that the juvenile court erred in relying on "facts extrinsic to the jurisdictional judgment"—specifically, the facts relating to Mu's alleged sexual abuse—to change the permanency plans for the children to adoption. They argue that they had no opportunity to contest those allegations, nor were they provided with remedial services to ameliorate the concerns raised by the allegations, if true. Consequently, parents assert, their substantial rights have been affected and, therefore, under our recent opinions in *Dept. of Human Services v.*

---

[7] The court also omitted the reference to the father having no visits with the child.

*G. E.*, 243 Or App 471, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011), and *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 266 P3d 107 (2011), they are entitled to reversal of the permanency judgments. We agree.

When a child is in substitute care, the juvenile court is required to hold periodic permanency hearings, including one "no later than 12 months after the ward was found within the jurisdiction of the court under ORS 419B.100 or 14 months after the child or ward was placed in substitute care, whichever is the earlier." ORS 419B.470(2). If, at the time of the hearing, the case plan is to reunify the family, the court must determine whether DHS has made "reasonable efforts" and whether the parent has made "sufficient progress" to make it possible for the child to safely return home. ORS 419B.476(2)(a). "Thus, to obtain a change in the permanency plan from return to parent to adoption, DHS must prove that, despite its reasonable efforts to effect reunification, the parents did not make sufficient progress to allow the child's safe return to the home." *State ex rel Juv. Dept. v. C. D. J.*, 229 Or App 160, 164-65, 211 P3d 289 (2009).

The particular issues of parental unfitness established in the jurisdictional judgment provide the framework for the court's analysis of each question—that is, both DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction. *State ex rel Juv. Dept. v. K. D.*, 228 Or App 506, 515, 209 P3d 810 (2009). Reliance on other facts can affect a parent's right to both notice of what conditions or circumstances the parent must remediate and a reasonable opportunity—through access to services—to remediate them. *See G. E.*, 243 Or App at 479-81 (holding that a court may not continue dependency jurisdiction over a child based on facts not alleged in or inferable from the jurisdictional petition, where reliance on those facts "affect[s] the substantial rights of the parent" (internal quotation marks omitted)); *see also N. M. S.*, 246 Or App at 297-98 (applying the reasoning of *G. E.* to a permanency judgment). Thus, if a court, in making its determination under ORS 419B.476(2)(a), relies on facts other than those

explicitly stated or fairly implied by the jurisdictional judgment, and doing so affects the substantial rights of a parent, the determination cannot be sustained.

Here, DHS does not contend that the threat of harm from sexual abuse was a condition or circumstance encompassed in the court's jurisdictional judgments.[8] Rather, the primary question raised by the parties' dispute in this case is whether the juvenile court did in fact rely on the sexual abuse allegations in changing the plans to adoption.[9] DHS contends that it did not. In DHS's view, the court changed the permanency plans, not based on the alleged sexual abuse, but because parents failed to make sufficient progress "in addressing their substance problems, mental health issues, and lack of stability." "To the extent the court considered the issue of sexual abuse," DHS asserts, "it was primarily to note that both children were 'emotionally disturbed,' and required specialized treatment and supervision that mother—given her own unresolved issues—was unable to provide."

DHS's reading of the juvenile court's decision does not withstand scrutiny. It is true, as DHS points out, that the court found that mother had recently tested positive for alcohol use, that her use of substances appeared to be enmeshed with father's, and that the psychologist who evaluated her opined that her mental health issues could not be addressed until she discontinued drug use. Similarly, the court found that father continued to give positive urinalyses and had significant mental health needs. However, the court also found that Mu "likely [had] experienced significant sexual abuse" and that, based on her disclosures to her therapists, was having "no visits at all with her father." Noting her severe sexual

---

[8] Nor could it. The jurisdictional judgments contain no facts relating to the alleged abuse of Mu, nor are concerns about sexual abuse implicit in the facts upon which jurisdiction was established. Thus, parents were never apprised that they would be required to address concerns raised by those allegations—for example, by participating in sex offender treatment or counseling or having mother separate from father—in order to secure the children's return.

[9] DHS also argues that ORS 419B.476 does not preclude the court from considering facts at a permanency hearing "beyond those constituting the bases for jurisdiction" and that the holding of *G. E.* was narrowly circumscribed to apply only in the context of a motion to dismiss jurisdiction. We rejected both of those arguments in *N. M. S.*, which was decided after the briefing in this case was complete. 246 Or App at 297-98.

reactivity, the court found that Mu would require specialized treatment and supervision. DHS argues that that discussion was intended only to demonstrate that Mu is a child with special needs that mother and father, with their substance abuse and mental health issues, would be unable to parent within a reasonable time.

We disagree. Immediately following its discussion of Mu's circumstances, the court ultimately concluded:

> "Given the barriers to father's reunification with the child, the child's unique needs, and the fact that parents present as a couple, mother's ability to parent the child within a reasonable time is extremely problematic."

Regarding Me, the court similarly concluded:

> "The child's 5-year-old sister presents as an emotionally disturbed child who likely [h]as experienced significant sexual abuse as well as substantial neglect. Given the barriers to father's reunification with this child, the even more substantial barriers to reunification with child's sibling, and the fact that the child's parents present as a couple, mother's ability to parent the child within a reasonable time is extremely problematic."

As a result, the court held, it was necessary to continue the children in substitute care because they could not safely be returned to parents. Hence, the court's decision to change the children's plans from reunification to adoption was based on three factors: (1) "the barriers" to father's reunification with the children; (2) Mu's special needs; and (3) the fact that parents "present as a couple." Taken in context, it is inescapable that the "barriers" to which the court refers include the alleged sexual abuse of Mu and resulting discontinuation of father's visits with her. Notably, the court explains that, although there are barriers to father reunifying with Me, there are "even more substantial barriers" preventing father from reunifying with Mu. The latter can only refer to the sexual abuse allegations and resulting consequences. If the court was relying on father's continued drug abuse and mental health issues only—and not on the facts surrounding the sexual abuse of Mu—as DHS contends, the barriers to father's reunification with respect to both children would necessarily be the same. Moreover, the third factor—that

parents "present as a couple"—indicates that the court attributed father's barriers to mother, including the barrier created by the allegations of sexual abuse, and relied on those barriers to conclude that mother would be unable to adequately parent the children within a reasonable time.[10] Under *G. E.* and *N. M. S.*, it was error for the court to do so.

DHS argues, however, that, even if the juvenile court improperly considered the sexual abuse allegations, the error was harmless, because "both parents have made insufficient progress in ameliorating the parental deficiencies that served as the bases for jurisdiction." The problem with that argument is that we cannot tell whether the court would have reached the same conclusions—that is, that DHS had made reasonable efforts, yet mother and father had failed to make sufficient progress to make it possible for the children to return home—in the absence of the sexual abuse allegations, on which the court was clearly focused. In other words, because the court did not indicate that mother's and father's lack of progress in addressing their substance abuse, mental health, and housing issues—despite reasonable efforts by DHS to address those issues—was independently *sufficient* to warrant changing the plans for the children to adoption, we cannot say that the error was harmless. Accordingly, we reverse and remand.

Reversed and remanded.

---

[10] This case illustrates the problems inherent in relying on facts that have not been established in the jurisdictional judgment as a basis for the permanency decision—here, as just discussed, those "extrinsic" facts led the court to conclude that, as long as father and mother were together, mother's ability to parent the children within a reasonable time was unlikely, and a move to adoption was warranted. Yet, as a result of the facts actually found in the jurisdictional judgment, mother was required to participate in couples counseling with father.