Argued and submitted March 2, reversed and remanded September 13, 2017

In the Matter of M. L.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. L.,
*Appellant.*

Clackamas County Circuit Court
110440J;
Petition Number 110440J02;
A163309

403 P3d 488

Holly Telerant, Deputy Public Defender, argued the cause for appellant. With her on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeVore, Presiding Judge, and Garrett, Judge, and Duncan, Judge pro tempore.

**DUNCAN, J. pro tempore**

In this juvenile dependency case, father appeals the juvenile court's judgment that changed the permanency plan for his daughter, M, from reunification to adoption. As required for such a change, the juvenile court concluded that the Department of Human Services (DHS) had made reasonable efforts to make it possible for M to safely return home, but that father had not made sufficient progress to make it possible for her to do so. Assessments of DHS's efforts and a parent's progress must be made in light of the bases for the juvenile court's jurisdiction. Here, the sole basis for the juvenile court's jurisdiction over M, as to father, was father's substance abuse. At the time of the permanency hearing at issue, it was undisputed that father had successfully remediated his substance abuse problem. The juvenile court's concern at the hearing was M's estrangement from father. The attorneys for DHS, M, and father informed the juvenile court that it could not change M's permanency plan based on the estrangement because it was not an adjudicated jurisdictional basis. The juvenile court disagreed and changed the plan. Because, as explained below, the juvenile court erred by changing the plan based on facts extrinsic to the jurisdictional judgment, we reverse and remand.

Whether a juvenile court erred by relying on facts extrinsic to a jurisdictional judgment "is a legal question that we review for errors of law." *Dept. of Human Services v. G. E.*, 243 Or App 471, 480, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011). When doing so, we review the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's determination and assess whether, when so viewed, the record was legally sufficient to permit that outcome. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-40, 307 P3d 444 (2013).

Father has three children, R, M, and T, but only M's permanency plan is at issue in this appeal.[1] In February 2013, when M was 11 years old, DHS took protective custody of the children. In April 2013, the juvenile court asserted

---

[1] Mother did not participate in the permanency hearing at issue and is not a party on appeal.

jurisdiction over the children based on a single allegation as to father—that "father's current and historical use of alcohol and controlled substances interferes with his ability to provide safe, appropriate and consistent care for the child." In the jurisdictional judgment, the juvenile court ordered father to participate in services, including a drug and alcohol evaluation, drug and alcohol treatment, random urinalyses, a psychological evaluation, and parent education classes.

In August 2013, father's counsel failed to appear on father's behalf at a permanency hearing, and in September 2013, based on evidence that had been presented at the August hearing, the juvenile court entered a permanency judgment changing M's plan from reunification to guardianship. Father appealed from the judgment, asserting, among other things, that he had received inadequate assistance of counsel. We affirmed, *Dept. of Human Services v. T. L.*, 269 Or App 454, 344 P3d 1123 (2015), but the Supreme Court reversed and remanded for the juvenile court to determine whether father was prejudiced by counsel's absence, *Dept. of Human Services v. T. L.*, 358 Or 679, 705, 369 P3d 1159 (2016).

In June 2016, at the hearing on remand, the parties stipulated to an order vacating the 2013 permanency judgment and reinstating the plan of reunification. By that time, M was 15 years old and had not had in-person contact with father in over two and a half years.[2] Because of the lack of contact, the parties also stipulated, and the juvenile court ordered, that "DHS shall engage a reintegration therapist or an equivalent service to assist Father and Child to overcome any current feelings of estrangement or alienation." The court then set a "short hearing" in September 2016 to review the progress of the reintegration therapy. It also set a hearing in December 2016 "to conduct a Permanency Hearing pursuant to ORS 419B.470(6)" and to hear any motion to dismiss filed by father.

In early August 2016, DHS arranged an initial meeting between father and M, but, by all accounts, the

---

[2] Father had visited M on a regular basis from March 2013 until mid-December 2013, at which point DHS terminated the visits because father had refused to provide DHS a urine sample.

meeting did not go well. Both M and father had different expectations going into the meeting. M believed that the meeting was an opportunity for her to tell father that she did not want to engage in therapy, that she wanted to be adopted by her foster care provider (the mother of one of M's friends), and that she wanted father to relinquish his parental rights. She also believed that her attorney and her court-appointed special advocate would be present to support her and help her facilitate the relinquishment. Father believed that the meeting would be a first step toward ongoing family therapy to build trust and develop a relationship after years of separation. At the meeting, he was surprised when M expressed her desire to be adopted and asked M to spend time with him before making that decision. M agreed, but later expressed to her therapist and foster care provider that she had felt pressured into doing so and did not want to visit with father. After the meeting, M refused to engage in further therapy with father or to have any contact with him.

At the September 2016 hearing, which is the hearing at issue in this appeal, the parties agreed that father was sober and had been for some time. He also had stable housing and full-time employment, and one of his children, R, had been returned to his care. Also at the hearing, DHS presented evidence about the meeting between M and father. M's caseworker testified that, after the meeting, M had felt "tricked" by DHS into attending the meeting, and that father was "manipulative" and "was trying to get her to change her mind and wasn't listening to her when she said she wanted to be adopted." In addition, M's therapist testified that, in asking M to agree to visit with him, it "kind of seemed like [father] was bargaining." She explained that she "would characterize the trust relationship or the trust that [M] has for her father" as "[n]one" and that she could not "imagine that [father's bargaining] helped build trust between them."

M also testified:

"I don't know I agree with respecting (indiscernible) or family counseling (indiscernible) because I haven't seen him in two-plus years so I don't know where anybody is going with that.

"* * * * *

"And for me, regardless of any of it, I want to be adopted. There's no changing my mind. There's no so many visits before I change my mind.

"I want to be adopted. I will not change my mind.

"If I do get placed with him, you'll never see me again. I'm not making a bluff. I'm not afraid to run. I've done it in the past. I do not want to be adopt—or I do not want to go back to my dad.

"I want to be adopted by not my foster provider, but my mom. She's been there for me through all of this, even before I was with her. I want to be adopted.

"That's it."

M's court-appointed special advocate moved to change M's permanency plan from reunification to adoption on the ground that adoption was "what's best for [M]." The advocate explained that she had worked with M for over three years, and although M had not previously expressed an interest in being adopted, she did once she was placed with her current foster care provider:

"[M] is a very strong-willed child. * * *. She knows what she wants. She's wanted this for—for—since she's been living with the new parents basically, where I've never heard her mention being adopted before.

"She wants to be adopted by this—this mom. This mom totally loves and cares for her and she feels so comfortable in that house."

Neither DHS nor M's attorney supported a change in plan at that time. Because the jurisdictional basis was substance abuse, which the parties agreed father had addressed, and because the case was in a "reunification posture," they did not believe that there was "sufficient reason to change the plan." Instead, they asserted that addressing the estrangement between M and father "would take * * * separate jurisdictional grounds." M's attorney explained:

"What needs to happen is the new petition that we've talked about for some time needs to be filed that has to do with the estrangement rather than the drug and alcohol

issue, because the drug and alcohol issue obviously has been addressed. There's no issue that it has not."

Similarly, father argued that the juvenile court lacked authority to change the plan because he had successfully remediated his substance abuse problem; alternatively, father argued that, even if the court could rely on the estrangement, DHS had not made reasonable efforts to address it:

"[ORS] 419B.476(2)(a) talks about the case plan being reunification and whether or not reasonable efforts have been made and whether the parent has made sufficient progress to make it possible for the ward to safely return home.

"* * * * *

"*The jurisdictional basis is substance abuse, and certainly [father] has made more than sufficient progress for the child to safely return home. He has a child in his home.*

"Your honor allowed that child to return to that home * * *. We dismissed wardship to accomplish that. And *there's no dispute that he is in full recovery and has remediated his substance abuse issues.*

"So as it relates to the court's authority to change the plan under [ORS] 419B.476(2)(a), I would submit to the court that * * * because of the jurisdictional basis which binds the Court's decision, he has more than compensated for that and the child could safely be returned home. *Therefore, it's not appropriate to change the plan today.*

"[Father] is looking forward to working *reunification therapy, which was ordered by [another judge].* And the purpose of that was to help father and child overcome feelings of estrangement or alienation.

"*The agency has failed to comply with that court order. The agency has not yet made a referral during the process* of trying to get one together for the Kinship House, and it will take them an additional 30 days, * * * which will be almost three months after it was ordered."

(Emphases added.)

After closing arguments, the juvenile court concluded that DHS had made reasonable efforts toward reunification

and that, despite these efforts, father had made insufficient progress to make it possible for M to safely return home. In its ruling from the bench, the juvenile court explained, in part:

"I do find that DHS made reasonable efforts to implement the reinstated reunification plan, given the extreme alienation that has taken root in the child over the years of estrangement.

"[Father's counsel] referred to [ORS 419B.476(2)(a)] as the provision of law that precludes a change of plan today, and that provision reads: The Court shall determine whether DHS has made reasonable efforts to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. Both of those things.

"And then it says: In making its determination, the Court shall consider the ward's health and safety as the paramount concerns.

"The child testified today that if she is forced to return to her father, she will run and she's not bluffing. She is categorically opposed to further reunification efforts. She is very clear that she will regress in the most harmful way if a reunification is forced, and I'm convinced that she means it.

"I believe that even an attempt to force [M] to engage with the Kinship House will place her at grave risk of regressing to unsafe behaviors that it took her two years to overcome. I do not believe that it is a reasonable risk to take, particularly given that the Court's number one statutory concern is the child's safety.

"*So it is not simply whether the parent has made sufficient progress. And as you know, because I returned [R] to you, I believe you have.* The problem is, you're not the only person in the case.

"* * * * *

"So I—*I acknowledge that father appears to have firmly beaten his addiction and I applaud him for that again.* Nonetheless, that—that was the original jurisdictional basis that created a dynamic with the child which continues to endanger her should she be forced to return home.

"* * * * *

"Like everyone here, I continue to hope for clarification between [M] and her father, and this ruling does not foreclose that possibility, but it is clear that with [M], *father has to do more than just beat his addiction to create safety for her.*

"He must also find a way to demonstrate to her that he trusts her in order to enable her to trust him and in order to create a situation in which she would not endanger herself by running away from any further contact with him at the expense of everything she has built in her life, which is substantial."

(Emphases added.)

After the hearing, the juvenile court issued a judgment that changed M's permanency plan from reunification to adoption, which father appeals.

On appeal, father asserts that, in changing the plan, the juvenile court erred in relying on facts extrinsic to the proven basis for jurisdiction, specifically, facts related to M's feelings of estrangement from her father and threats to run away if she were returned to his care.[3] According to father, the juvenile court could not rely on those facts because they were "never alleged and proven as a basis for jurisdiction." They were "extrinsic to father's substance abuse because father could not have been expected to know from the court's assertion of jurisdiction that his failure to independently remedy the estrangement between him and his daughter could result in the termination of his parental rights."

We begin our analysis with a review of juvenile dependency law. As we have observed, the statutes governing dependency jurisdiction are intended to protect the interests of children and parents and to promote family reunification, in all but extreme cases:

"The state policies underlying dependency jurisdiction in Oregon include 'safeguard[ing] and promot[ing] each child's right to safety, stability and well-being.' ORS 419B.090(3);

---

[3] Father also renews his argument that, even if the juvenile court could rely on the estrangement, it erred in concluding that DHS had made reasonable efforts to address the estrangement. Because we agree that the juvenile court erred by relying on the estrangement, we do not address father's alternative argument.

'guard[ing] the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution,' ORS 419B.090(4); and, other than in cases of extreme conduct under ORS 419B.502, 'offer[ing] appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time,' ORS 419B.090(5)."

*Dept. of Human Services v. N. M. S.*, 246 Or App 284, 292, 266 P3d 107 (2011) (brackets in *N. M. S.*).

The juvenile court has exclusive jurisdiction "in any case involving a person who is under 18 years of age" and "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others[.]" ORS 419B.100(1). As we explained in *N. M. S.*:

"Under ORS 419B.809(4)(b), a petition alleging jurisdiction under ORS 419B.100 'must set forth in ordinary and concise language' 'the facts that bring the child within the jurisdiction of the court, including sufficient information to put the parties on notice of the issues in the proceeding.' The court's task is to determine whether the facts, if proved or admitted, would be sufficient to establish jurisdiction under ORS 419B.100."

246 Or App at 293. Additionally, "[t]he court, on motion of an interested party or on its own motion, may at any time direct the petition be amended. If the amendment results in a substantial departure from the facts originally alleged, the court shall grant such continuance as the interests of justice may require." ORS 419B.809(6).

Generally, a juvenile court must conduct a permanency hearing within 12 months after a child is found within the court's jurisdiction or within 14 months after the child is placed in substitute care, whichever is earlier. ORS 419B.470(2). Changes to permanency plans are governed by ORS 419B.476. As relevant here, ORS 419B.476(2)(a) provides:

"If the case plan at the time of the hearing is to reunify the family, [the juvenile court shall] determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has

made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

Thus, to change a child's permanency plan away from reunification, the proponent of the change must prove by a preponderance of the evidence, and the juvenile court must determine, both "that (1) [DHS] has made reasonable efforts to make it possible for the child to be reunified with his or her parent and (2) notwithstanding those efforts, the parent's progress was insufficient to make reunification possible." *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017).[4]

As we explained in *Dept. of Human Services v. N. T.*, 247 Or App 706, 715-16, 271 P3d 143 (2012),

"both DHS's efforts and a parent's progress are evaluated with reference to the facts that formed the bases for juvenile court jurisdiction. * * * [I]f a court, in making its determination under ORS 419B.476(2)(a), relies on facts other than those explicitly stated or fairly implied by the jurisdictional judgment, and in doing so affects the substantial rights of a parent, the determination cannot be sustained."

(Emphasis added; some internal citations omitted.); *see also N. M. S.*, 246 Or App at 300 ("[I]f the parental condition or characteristic is *not* one that fairly can be implied from the facts found in the jurisdictional judgment, then it is outside the scope of the court's jurisdiction[.]" (Emphasis in original.)). Facts are not "fairly implied" by a jurisdictional judgment, and thus are "extrinsic" to the jurisdictional judgment, if a reasonable parent would not have known from the jurisdictional judgment that he or she needed to address the condition or circumstance exemplified by those facts. *See G. E.*, 243 Or App at 480 (reliance on facts not expressly alleged in a petition "substantially affect[s] a parent's rights if a reasonable parent would not have had notice from the petition or the jurisdictional judgment as to what he or she

---

[4] In addition, when, as here, a party seeks to change a plan to adoption the party must also prove by a preponderance of the evidence that none of the circumstances set forth in ORS 419B.498(2) apply; those circumstances negate the requirement that DHS file a petition to terminate the parents' rights. ORS 419B.476(5)(d).

must do in order to prevent the state from assuming or continuing jurisdiction over the child"); *N. M. S.*, 246 Or App at 300-01 (applying the standard from *G. E.* in the permanency context). Consequently, if an interested party seeks to change a child's permanency plan based on a fact other than one explicitly stated or fairly implied by the jurisdictional judgment, the party must petition for and obtain an amended jurisdictional judgment.

For example, in *N. M. S.*, 246 Or App at 300-01, where the juvenile court asserted jurisdiction over the mother's children based on a nonaccidental injury to one of the children, we reversed the juvenile court's subsequent change of the children's permanency plans from reunification to adoption on the ground that, in determining that the requirements for the change had been satisfied, the juvenile court had relied, in part, on concerns about the mother's general parenting and housekeeping skills. We explained that "although [the] mother was on notice from the jurisdictional judgment that she needed to address any condition that *could have caused the risk of nonaccidental injury* to her children, such conditions would not, in any event, include general parenting skills or poor housekeeping." *Id.* at 301 (emphasis in original).

Similarly, in *Dept. of Human Services v. J. R. L.*, 256 Or App 437, 450-52, 300 P3d 291 (2013), where the juvenile court asserted jurisdiction over the mother's child based on the mother's lack of suitable housing, we held that the juvenile court erred in changing the child's permanency plan from reunification to adoption based on the mother's failure to address her depression and anxiety. We concluded that the mother "was not given adequate notice that her progress toward obtaining safe and stable housing could be measured by her progress in addressing her mental health issues." *Id.* at 449; *see also Dept. of Human Services v. A. R. S.*, 256 Or App 653, 664, 330 P3d 963, *rev den*, 354 Or 386 (2013) (juvenile court erred in changing permanency plan based on the mother's purported personality disorder because, even if mother had an underlying personality disorder, "nothing in the jurisdictional judgment would have alerted mother to [the] proposition" that she needed to address her mental

health condition "to cure the conditions that formed the bases for the court's jurisdiction").

Here, the jurisdictional judgment expressly identified a single barrier to M and father's reunification, father's substance abuse. As noted, at the permanency hearing, the parties agreed that father had been sober for some time, and the juvenile court observed that "father appears to have firmly beaten his addiction" and that it had "returned [R]" to father. Nevertheless, the juvenile court concluded that father had not made sufficient progress to make it possible for M to safely return home. According to the court, father had "to do more than just beat his addiction to create safety for [M]."

In so concluding, the court improperly relied on evidence relating to the estrangement between M and father— including evidence that M was alienated from father, did not want to be reunified with him, and would regress to unsafe behaviors if reunification was pursued. The estrangement was a circumstance that had never been established as a basis for jurisdiction in this case. It was not a fact that was explicitly stated or fairly implied by the jurisdictional judgment.

The juvenile court's oral ruling reveals that the court erroneously believed that it was authorized to rely, almost entirely, on the purported estrangement between M and father in making its determinations under ORS 419B.476(2)(a) for two reasons: (1) because the estrangement was a consequence of father's substance abuse, and (2) because ORS 419B.476(2)(a) requires the court to "consider the ward's health and safety the paramount concerns" and the estrangement created a situation "in which [M] would endanger herself by running away from any further contact with him."

With regards to the juvenile court's first reason, even assuming that "the original jurisdictional basis * * * created [the] dynamic" of estrangement, that dynamic itself cannot provide a basis for the court's permanency determination, because the estrangement is a circumstance that is not fairly implied by the jurisdictional petition or judgment. Father could not be expected to know from the jurisdictional

judgment that his progress in addressing his substance abuse, the sole barrier to reunification expressly identified in the judgment, could be measured by his ability to address any estrangement that might develop between him and M. The estrangement was a separate issue from the substance abuse. The petition and report from DHS's initial investigation indicate that DHS was primarily concerned that father's substance abuse impaired his ability to parent M, because it caused him to expose the children to controlled substances and caused the children to have poor school attendance.

Indeed, there is no evidence that the estrangement even existed at the time of the jurisdictional judgment. To the contrary, court reports in the record indicate that M continued to express a strong desire to return home to her parents for years after her removal, and M's court-appointed special advocate informed the court that M had not expressed an interest in being adopted until being placed with her current foster care provider.

A juvenile court cannot base its permanency determinations on the "consequences" of a condition that is the jurisdictional basis if the condition no longer persists and the consequences themselves are not expressly stated in, and cannot be fairly implied from, the jurisdictional judgment. To hold otherwise would deprive a parent of constitutionally adequate notice of a deficiency that has been identified as a barrier to the child's return home and of a meaningful opportunity to address the deficiency with the support of services provided by DHS; and would circumvent the jurisdictional petition and hearing process.

With regards to the juvenile court's second reason, the mandate in ORS 419B.476(2)(a) that "the court shall consider the ward's health and safety the paramount concerns" does not authorize a juvenile court to change a child's plan because of risks posed by an unadjudicated condition or circumstance. Although the record supports the court's conclusion that M would be in danger "should she be forced to return home," we have rejected the notion that a juvenile court can change a permanency plan based on parental deficiencies that are not expressly stated in or fairly implied by the jurisdictional judgment, even if those deficiencies

endanger a child. In *N. M. S.*, DHS argued that the reasoning in *G. E.* should not apply in the permanency context based, in part, on the concern that "the juvenile court 'cannot simply ignore' serious parental deficiencies * * * that are apparent at the time of the permanency hearing, but that were not the basis for jurisdiction[.]"[5] 246 Or App at 298. In rejecting that argument, we explained, "*G. E.* does not require the court to ignore such deficiencies; rather, it envisions amendment of the jurisdictional petition in those circumstances[.]" *Id.*; *see also G. E.*, 243 Or App at 481 (when the substantial rights of a parent are affected by a change in "facts," "the court must direct that the petition be amended and grant such continuance as the interests of justice may require"). Thus, a juvenile court may not circumvent statutory procedures, which are intended to protect both children and parents by ensuring adequate notice, provision of reasonable services directed toward reunification, and allowance of a reasonable time to make progress toward reunification. Where, as here, a juvenile court has concerns about an unadjudicated condition or circumstance, the court, on the motion of an interested party or on its own motion, can direct that the petition be amended, and, thereby, set in motion the proper procedures for addressing any possible endangerment. Thus, when faced with extrinsic facts related to the estrangement between M and father and indicating that that estrangement posed risks to M's safety, the court should have, as the attorneys for DHS, M, and father suggested at the hearing, directed that the petition be amended.[6]

---

[5] Similarly, in this case, DHS argues that "father's argument that this court should not consider [M]'s testimony asks this court to ignore the statutory mandate that, in determining the permanency plan, the court 'shall consider the ward's health and safety the paramount concerns.'"

[6] For its part, on appeal DHS argues that the parties' stipulation at the June 2016 hearing that the juvenile court would order reunification therapy, and statements made by the court during that hearing, establish that "father and the other parties to the case considered the reunification therapy—which was necessary to address the estrangement—to be part and parcel of the services related to the substance abuse allegation, and that 'alienation' was not a separate basis for jurisdiction." We disagree. Nothing in the stipulation itself or the court's explanation of the stipulation indicates that the parties understood "alienation" to be a part of the substance abuse basis for jurisdiction. Indeed, DHS's assertion at the September 2016 permanency hearing was to the contrary. As described above, DHS informed the juvenile court that it could not change M's plan without amending the jurisdictional judgment.

In summary, because the juvenile court based its permanency determinations on circumstances not fairly implied by the jurisdictional judgment, we reverse and remand.

Reversed and remanded.

---

At oral argument, DHS also argued that a change in plan was permissible because father had actual notice of his need to remedy the problem. In support of that contention, DHS again relies on the parties' stipulation at the June 2016 hearing that the juvenile court would order reunification therapy. But, it is clear from the record that father did *not* stipulate that the jurisdictional judgment should be amended to include the estrangement as a basis. Thus, his stipulation cannot remedy the lack of constitutionally adequate notice in the jurisdictional judgment. As we explained in *N. M. S.*,

"[I]f the parental condition or characteristic is *not* one that fairly can be implied from the facts found in the jurisdictional judgment, *then it is outside the scope of the court's jurisdiction, and that deficit cannot be remedied by claims of 'actual notice' through case plans or *** letters of expectation.* That is so because, as we held in *G. E.*, a petition or jurisdictional judgment must provide a parent with reasonable notice of the deficiencies that he or she must address in order to prevent continued jurisdiction; if it does not, it affects a 'substantial right' of the parent—*viz.*, the right to constitutionally adequate notice—and the petition or judgment must be amended before the court can rely on such 'extrinsic facts' in its permanency decision."

246 Or App at 300 (first emphasis in original; second emphasis added); *see also J. R. L.*, 256 Or App at 449-50 (quoting *N. M. S.* to reject DHS's argument that mother had actual notice that her unadjudicated mental health issues could be used to measure her progress for permanency purposes because court reports "indicated that mother needed to address her depression and anxiety issues" and that those issues "'play[ed] into [her] lack of follow through in both the areas of employment and housing,'" which were adjudicated jurisdictional bases (brackets in original)).