Submitted February 14 on respondent's motion to dismiss filed March 16, appellant's response filed March 30, respondent's reply filed April 6, and appellant's sur-reply filed April 12; motion to dismiss denied, affirmed June 14; petition for rewiew denied October 5, 2023 (371 Or 476)

In the Matter of S. H. P.,
aka S. T., aka S. T., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. G. J.,
*Appellant.*

Jackson County Circuit Court
20JU02316; A179410 (Control)

In the Matter of P. J. R. J.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. G. J.,
*Appellant.*

Jackson County Circuit Court
20JU06985; A179411

532 P3d 905

Mother appeals from two judgments changing the permanency plans for two of her children from reunification to tribal customary adoption. Mother argues that the juvenile court erred in determining that the Department of Human Services (DHS) made active efforts to reunify the family and that mother's progress was insufficient to make it possible for the children to be safely returned to her care. Mother also argues that the juvenile court relied on extrinsic facts to evaluate mother's progress. *Held*: The evidence in the record was legally sufficient to support the juvenile court's determination that DHS made active efforts and that mother made insufficient progress. DHS referred mother to numerous services to address concerns about the children's exposure to domestic violence and mother's substance abuse, but mother did not complete any of those services. The juvenile court did not rely on extrinsic facts when it changed the plans to tribal customary adoption, a change supported by the Pit River Tribe. DHS moved to dismiss the appeal but failed to meet its burden of showing that the appeal was moot.

Motion to dismiss denied; affirmed.

David J. Orr, Judge.

Kristen G. Williams filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Kirsten M. Naito, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

PAGÁN, J.

Motion to dismiss denied; affirmed.

**PAGÁN, J.**

This is a juvenile dependency proceeding that concerns two of mother's children, S and P, both of whom are Indian children within the meaning of the Oregon Indian Child Welfare Act (ORICWA) and the federal Indian Child Welfare Act (ICWA). *See* ORS 419B.600 - 419B.665; Indian Child Welfare Act of 1978, 25 USC §§ 1901 - 1963. Mother appeals from two judgments changing the permanency plans for S and P from reunification to tribal customary adoption (TCA).[1] Mother raises nine assignments of error. We summarily reject mother's seventh, eighth, and ninth assignments of error which purport to make arguments on behalf of S's father. S's father is not a party to this appeal, he did not appear at the permanency hearing, and mother did not preserve her ability, if any, to make arguments on his behalf. In mother's first through sixth assignments of error, she asserts that the juvenile court erred in determining that DHS had made active efforts, that her progress toward reunification was insufficient, and that the permanency plans should be changed. We are not persuaded that the juvenile court erred when it changed the plans from reunification to TCA. We therefore affirm.

Changes to permanency plans are governed by ORS 419B.476. As relevant here, ORS 419B.476(2)(a) provides:

> "If the case plan at the time of the hearing is to reunify the family, [the court shall] determine whether [DHS] has made reasonable efforts or, if the ward is an Indian child, active efforts as described in ORS 419B.645 to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

"Active efforts" are efforts that are "affirmative, active, thorough, timely and intended to maintain or reunite an Indian child with the Indian child's family." ORS 419B.645(1).

---

[1] S's father and P's father are not parties to this appeal. A "tribal customary adoption" is "the adoption of an Indian child, by and through the tribal custom, traditions or law of the child's tribe, and which may be effected without the termination of parental rights." ORS 419B.656(1).

In juvenile cases, "other than proceedings for termination of parental rights, the exercise of *de novo* review is within our sole discretion." *Dept. of Human Services v. N. S.*, 246 Or App 341, 344, 265 P3d 792 (2011), *rev den*, 351 Or 586 (2012). A TCA may occur without the termination of parental rights, the parties do not argue that the case is exceptional, ORAP 5.40(8)(c), and they do not request *de novo* review. Consequently, we review the juvenile court's "legal conclusions for errors of law and are bound by its findings of historical fact if there is any evidence in the record to support them." *Dept. of Human Services v. K. S. W.*, 299 Or App 668, 670, 450 P3d 1029 (2019). Regarding the juvenile court's determinations, "we review the evidence * * * in the light most favorable to the juvenile court's determination and assess whether, when so viewed, the record was legally sufficient to permit" the permanency plan changes. *Dept. of Human Services v. T. L.*, 287 Or App 753, 755, 403 P3d 488 (2017). We describe the facts with a focus on DHS's efforts and mother's progress.

## FACTS

In April 2020, DHS filed a dependency petition regarding S, who was three years old. The petition alleged that S was at risk of harm due to exposure to domestic violence. At that time, mother was pregnant with P. Mother was a victim of domestic violence involving P's father, but she continued to have contact with him. S and her older sister, J, were removed from mother's care.[2] Mother filed for a restraining order against P's father. In June 2020, the juvenile court entered a jurisdictional judgment for S based on mother's admission that domestic violence placed S at risk of harm.[3]

At the time the juvenile court took jurisdiction over S, DHS created an action agreement for mother, who agreed to engage in domestic violence classes and parenting classes. DHS reviewed those services with mother during family engagement meetings and made referrals. However,

---

[2] J's case was closed when she was placed with her father.

[3] In February 2021, a second dependency petition was filed for S based on new information about S's biological father. In April 2021, the juvenile court entered a new jurisdictional judgment for S.

mother failed to begin or follow through with the court-ordered services. DHS referred mother to Adapt Navigator, to assist mother with housing, but mother failed to engage with the service.

In June 2020, DHS referred mother to Parker House, a women's-only facility that provides housing for victims of domestic violence. DHS returned S and her older sister to mother's care, but due to complaints that mother was failing to supervise her children, and unexcused absences from Parker House, mother was terminated from the program and she and the children had to move out. In August 2020, DHS referred mother to another housing facility called Hope House. Around the same time, DHS referred mother to the Family Nurturing Center for parenting assistance and help finding housing. Mother failed to engage with the services offered by the center, and the referral was closed without completion.

In August 2020, mother gave birth to P. In September 2020, a caseworker discovered that mother and her children had been absent from Hope House for over a week. Mother had moved out of Hope House and moved into a hotel called the Red Roof Inn. In October 2020, DHS discovered that P's father was also staying at the hotel. He was arrested. Mother moved out of the hotel and into a Traveler's Inn. During that time, DHS consulted with mother's tribe, the Pit River Tribe, and made additional referrals to mother for services, including to Family Solutions, but mother did not follow through.

In December 2020, mother was evicted from the Traveler's Inn because she assaulted a person at the hotel in an incident that involved P's father. DHS received reports that the children were exposed to domestic violence, and that mother was abusing controlled substances. Mother admitted using methamphetamine.

DHS assisted mother with a move to another hotel, and it made plans to assist mother to move with all three children to Harney County, where J's father lived, but the plan changed when mother was required to go to the hospital with P. DHS called law enforcement for a welfare check

on S and J. The police found P's father in the hotel room with the two children. The police also found drug paraphernalia in the room. P's father had escaped from work release to be with mother. P's father was arrested, and DHS removed all three children from mother's care.

After that incident, DHS filed a dependency petition for P, which alleged that P, who was three months old, was at risk of harm for reasons including exposure to domestic violence, and mother's substance abuse, "chaotic lifestyle," and "residential instability." DHS placed J, mother's oldest child, with J's father in Harney County. S and P were placed in foster care.

In February 2021, the juvenile court entered a judgment asserting jurisdiction over P. After the jurisdictional hearing, DHS went over the terms of an action agreement with mother. DHS referred mother to Addictions Recovery in Harney County, where she participated in some drug testing and a drug and alcohol assessment, but the referral was closed due to mother's lack of continued participation.

In March 2021, mother was admitted for inpatient treatment at the Native American Rehabilitation Association (NARA) in Portland, and S and P were returned to her care. However, while at NARA, mother continued to have contact with P's father. In April 2021, mother was terminated from NARA for violating the terms of her behavioral contract, which required her to cease "socializing and communicating with male peers." Her problems at NARA included "fraternizing with men, not following basic rules, being disrespectful to staff and entering people's room[s]." After mother's termination from NARA, DHS returned S and P to foster care.

In May or June 2021, a new DHS caseworker was assigned, who provided mother with copies of her action agreements and discussed with mother the services that she was required to complete. By that time, which was over a year after the initial dependency petition was filed, mother had not completed any court-ordered services. DHS continued to work with mother and the tribe. In June 2021, mother participated in an alcohol and drug assessment at

Phoenix Counseling. The service assessed mother as requiring intensive outpatient treatment, but mother would only agree to participate in a relapse prevention class, which met less frequently. Mother did not attend consistently, and she was terminated from the program in November 2021.

In July 2021, DHS referred mother to a domestic violence advocate and made bus passes available, but mother failed to pick up the passes or connect with the advocate. In September 2021, DHS referred mother, once again, to Adapt Navigator to help her find housing. Adapt Navigator had difficulty connecting with mother, and the service was eventually terminated due to lack of engagement.

DHS referred mother for a psychological evaluation. Mother missed appointments in September, November, and December 2021, but she completed the evaluation in January 2022. Mother was described as having "a tendency to go against the grain of authority on a steady basis." After DHS received the resulting report, DHS offered to have a qualified mental health professional review the report with mother, but she did not respond to that offer.

In November 2021, mother moved into a shelter facility in Grants Pass called the Women's Gospel Rescue Mission. Mother requested copies of her action agreements. While at the facility, mother attended parenting classes. In December 2021, mother completed an online domestic violence class and an online parenting class. However, DHS learned that the classes consisted of reading material only, and, during meetings with mother, DHS expressed concern about its ability to evaluate mother's retention, understanding, or internalization of the material.

In February 2022, mother was required to leave the Women's Gospel Rescue Mission. "It was reported that there were concerns regarding fraternization with the men at the men's mission and after conversations redirecting the behavior, the behavior continued." That program did not permit fraternizing with men because it sought to help women to break the cycle that led to domestic violence.

Each time DHS removed S and P from mother's care, DHS attempted to find relative placements who met

ICWA requirements. In August 2021, DHS began the process of moving S and P to Illinois to reside with mother's cousin, who was willing to serve as a placement. Mother's cousin was eligible for enrollment in the Pit River Tribe; he began the process of enrolling, and the tribe approved the placement.

In February 2022, DHS moved S and P to Illinois. P transitioned well, but S had trouble adjusting to the move. S shared with the resource parent that she had witnessed domestic violence between mother and P's father. S suffered from a speech impediment, but, by the time of the permanency hearing, S's speech and behavior had improved with therapy.

After the children were moved to Illinois, mother did not attend all virtual visits, but she did visit virtually with S and P once a week on Saturdays. In April 2022, mother's cousin informed DHS that he could no longer supervise the visits because S behaved inappropriately, and mother made inappropriate comments. DHS arranged for a professional third-party to supervise the visits, but mother stopped visiting with her children. Mother's cousin asked mother to restart the visits, but mother responded that "she wasn't going to allow agencies to control the narrative." Mother's cousin reported that S missed her mother.

In March 2022, mother emailed DHS and directed her caseworker to stop contacting her. Mother wanted DHS to assign a new caseworker. The DHS caseworker continued to attempt to make contact with mother between March and June 2022, but mother never replied. In April 2022, DHS requested a change of plan for the two children from reunification to TCA.

In June 2022, the juvenile court held a permanency hearing for S and P. At the time of the hearing, P's father was incarcerated, and he appeared by telephone. He did not object to changing the plan for P to TCA. DHS was unable to contact S's father, and he did not appear at the hearing. Mother attended the hearing and testified regarding recent positive changes she had made. Mother was not in a relationship, and she had no contact with P's father for over a year. Mother was staying clean and sober.

At the end of the hearing, the juvenile court commended mother for her positive changes, and stated that it found her testimony to be credible and sincere. However, the juvenile court found that mother had not made sufficient progress for reunification. The court also determined that DHS had made active efforts to safely return the children home. The court entered permanency judgments for both children changing their plans to TCA. Mother appeals.[4]

## ANALYSIS

At the permanency hearing, the juvenile court must determine whether DHS made "active efforts" to reunify the family and whether the parent made "sufficient progress" for the safe return of the child or children. ORS 419B.476(2)(a). DHS could show it made active efforts by, among other things, conducting a comprehensive assessment of the circumstances of the Indian child's family with a focus on reunification, by identifying appropriate services, and by inviting representatives of the Indian child's tribe to participate in providing support and services. ORS 419B.645(5). In determining whether a parent has made sufficient progress, "the juvenile court gives the highest priority to a child's health and welfare." *Dept. of Human Services v. M. K.*, 285 Or App 448, 460, 396 P3d 294, *rev den*, 361 Or 885 (2017). "Even if a parent has completed all services that have been required, evidence that a parent continues to engage in behavior that is harmful to a child supports a determination that the parent has not made sufficient progress to make it possible for the child to return home." *Dept. of Human Services v. G. N.*, 263 Or App 287, 297, 328 P3d 728, *rev den*, 356 Or 638 (2014).

---

[4] DHS has moved to dismiss the appeal as moot because, in March 2023, the juvenile court accepted the TCAs, entered judgments of adoption, and terminated its jurisdiction over S and P. Mother asserts that she is challenging the TCAs within the mechanisms provided by the Pit River Tribe and, as such, this decision may be relevant for those proceedings. In addition, mother has appealed the judgments of adoption. Under those circumstances, we conclude that DHS has not met its burden of showing that the appeal is moot because our resolution of the arguments that mother raises in this appeal could have a practical effect on mother's rights. *See State v. K. J. B.*, 362 Or 777, 785, 416 P3d 291 (2018) ("[A] case becomes moot when a court's decision will no longer have a practical effect on the rights of the parties." (Internal quotation marks omitted.)); *see also Dept. of Human Services v. K. J. V.*, 320 Or App 56, 61-62, 512 P3d 469 (2022) (appeal not moot because resolution of mother's arguments could have an impact on whether DHS should have consented to adoption). For those reasons, we deny DHS's motion to dismiss the appeal.

As noted above, mother contends that the juvenile court erred by ruling that DHS made active efforts and that her progress toward reunification was insufficient. More specifically, mother argues that, by the time of the permanency hearing, there was no evidence that domestic violence continued to endanger S or P. Mother faults the juvenile court for relying on "extrinsic facts"—that is, facts extrinsic to the bases on which the juvenile court exercised jurisdiction over the children—including mother's failure to visit with her children, and her "ego," and she challenges whether DHS made active efforts to reunify the family.

DHS responds that mother failed to preserve her arguments that DHS did not make active efforts or that the juvenile court relied on extrinsic facts. We begin with the preservation question. "The general requirement that an issue, to be raised and considered on appeal, ordinarily must first be presented to the trial court is well-settled in our jurisprudence." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). The policies underlying the preservation requirement include providing "a trial court the chance to consider and rule on an objection," ensuring fairness to an opposing party, and fostering "full development of the record, which aids the trial court in making a decision and the appellate court in reviewing it." *Id.*

Considering those policies, we conclude that mother largely preserved her appellate arguments. At the end of the permanency hearing, mother challenged whether the state had "met its burden to change the plan to tribal adoption by clear and convincing evidence as to all the required elements in this case." Those elements include whether DHS made "active efforts" and whether the parent made "sufficient progress." ORS 419B.476(2)(a). At the beginning of the two-day permanency hearing, DHS argued that the juvenile court was required to focus on "two issues. Has the agency made active efforts to return these children to a parent, and has the parent made sufficient progress to allow the children to return?" Certainly, the record is well-developed regarding DHS's efforts and mother's progress. We conclude that mother can challenge the juvenile court's findings regarding active efforts. Turning to mother's argument regarding whether the juvenile court relied on extrinsic facts, we need

not decide whether that argument is preserved. Even assuming that it is preserved, we conclude below that the juvenile court did not rely on evidence extrinsic to the jurisdictional bases when changing the plans away from reunification.

On the merits, we disagree with mother's claim that, by the time of the permanency hearing, there was no evidence of a risk that S or P would be exposed to domestic violence. At the permanency hearing, mother testified that she had no contact with P's father for over a year. However, P's father was incarcerated during most or all of that time. Mother admitted that her prior relationships with S's father and J's father also involved domestic violence. Yet, throughout the course of this case, and up until the time that he was incarcerated, mother repeatedly had contact with P's father. More importantly, mother failed to engage with or complete any court-ordered services for victims of domestic violence, despite numerous referrals by DHS.

In December 2021, mother completed an online domestic violence course that she had found herself, but, according to an expert witness called to testify by DHS, that course was not aligned with DHS's requirements because it did not involve group sessions, sharing information, or developing insight. A DHS caseworker also testified regarding the limitations of the online domestic violence class completed by mother. After mother completed that class, she was discharged from the Women's Gospel Rescue Mission in February 2022. Thus, the record supports the juvenile court's conclusion that mother failed to make sufficient progress addressing DHS's concerns about domestic violence. *See T. L.*, 287 Or App at 755 (we focus on whether the evidence in the record was legally sufficient to support the juvenile court's determination).

Next, mother argues that the juvenile court erred by relying on extrinsic facts to evaluate mother's progress. Mother claims that the juvenile court relied on her failure to maintain visits with the children, and her ego. We are not persuaded that the juvenile court relied on those facts in making its determination.

Regarding extrinsic facts, a juvenile court may not "change the permanency plan for the child from reunification

to adoption based on conditions or circumstances that are not explicitly stated or fairly implied by the jurisdictional judgment." *Dept. of Human Services v. A. R. S.*, 256 Or App 653, 660, 303 P3d 963, *rev den*, 354 Or 386 (2013). The jurisdictional judgment serves to provide a parent with constitutionally adequate notice of the deficiencies that must be addressed. *Dept. of Human Services v. N. M. S.*, 246 Or App 284, 300, 266 P3d 107 (2011). Therefore, a juvenile court's reliance on extrinsic facts "can affect a parent's right to both notice of what conditions or circumstances the parent must remediate and a reasonable opportunity—through access to services—to remediate them." *Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012).

Here, when making its findings at the end of the two-day permanency hearing, the juvenile court commented upon mother's failure to visit with her children since April 2022, and her tendency to be controlled by her "ego," but the juvenile court did not rely on those facts to evaluate mother's progress. Instead, the juvenile court relied on mother's failure to complete any court-ordered services. Based on the action agreements and numerous referrals, it is clear that mother had notice of the need to engage with those services. Yet, she repeatedly failed to do so. When the juvenile court commented upon mother's failure to visit with her children and her ego, the court was pointing out that her conduct and approach were harmful to the children. Those comments were not inappropriate because, in determining whether mother made sufficient progress, the juvenile court was required to consider the health and safety of the children. *See M. K.*, 285 Or App at 460 ("the juvenile court gives the highest priority to a child's health and welfare").

Although mother's housing and employment situation had improved by the time of the permanency hearing, mother failed to engage with or complete services designed to combat substance abuse, which was a basis for jurisdiction over P. Mother was terminated from inpatient treatment at NARA, and she refused to participate in outpatient treatment offered by Phoenix Counseling. When asked how she planned to stay clean and sober without going to treatment, mother responded, "It's sheer will and wanting to be there

for my children." However, a clinical supervisor from NARA testified that mother faced a high risk of relapse. Based on the evidence of mother's repeated failures to participate in or complete services, the juvenile court did not err when it concluded that mother had not made sufficient progress for the safe return of her children. *See Dept. of Human Services v. M. D. P.*, 285 Or App 707, 717, 397 P3d 582, *rev den*, 361 Or 803, 361 Or 885 (2017) (concluding that parents did not make sufficient progress in part because "each parent had yet to successfully complete specifically ordered programs that were intended to address their ability to care for and protect the children").

Mother also argues that DHS failed to make active efforts to assist her in maintaining visitation and to work collaboratively with DHS. We disagree. The DHS case-worker who took over the case in May or June of 2021 testified that she sent mother between 150 and 180 emails. The caseworker attempted to contact mother by telephone. After mother was terminated from the Women's Gospel Rescue Mission in February 2022, mother did not inform DHS that she had been terminated or provide new contact information. As a result, DHS could not visit with mother in person, or assess her living conditions. When the children were moved to Illinois, a move supported by the tribe, DHS arranged for a third party to facilitate online visits between mother and S and P, but mother did not make herself available for those visits. Considering the record, and especially given the numerous services offered to mother, there is ample support for the juvenile court's determination that DHS made active efforts to reunify mother with her children. *See Dept. of Human Services v. L. B.*, 325 Or App 176, 181-82, 528 P3d 808 (2023) (affirming change in plan where the record showed that DHS actively worked with mother, her children, and the tribe toward reunification).

Motion to dismiss denied; affirmed.