Argued and submitted October 12, 2016, reversed and remanded
January 5, 2017

In the Matter of D. J. B., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. M. H.
and D. T. B.,
*Appellants.*

Deschutes County Circuit Court
BENDES09;
Petition Number 14JV0194;
A162054 (Control)

In the Matter of B. G., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. M. H.
and T. G.,
*Appellants.*

Deschutes County Circuit Court
GEEBLA13;
Petition Number 14JV0194;
A162055

In the Matter of S. H., a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

S. M. H.,
*Appellant.*

Deschutes County Circuit Court
15JV0084;
Petition Number HENSAY15;
A162056

388 P3d 1204

Ginger Fitch argued the cause and filed the brief for appellant D. T. B.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Holly Telerant, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant S. M. H.

G. Aron Perez-Selsky filed the brief for appellant T. G.

Inge D. Wells, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

**GARRETT, J.**

In this consolidated juvenile dependency case, three parents separately appeal judgments of the juvenile court changing the permanency plans for three children from reunification to guardianship. All three parents were incarcerated at the time of the permanency hearing, and parents assign error to the juvenile court's finding that the Department of Human Services (DHS) made reasonable efforts to make reunification possible as required by ORS 419B.476(2)(a). For the reasons explained below, we conclude that, as to mother, the record lacks sufficient evidence to support the trial court's conclusion that DHS made reasonable efforts within the meaning of the statute. As a result, the permanency judgments with respect to all three children must be reversed. In light of that disposition, it is not necessary to address the two fathers' arguments that DHS also failed to make reasonable efforts on their behalf, and we decline to do so.

The parties do not request that we engage in *de novo* review under ORS 19.415(3)(b), and we do not identify a basis for so doing. *See* ORAP 5.40(8)(c) (providing that we will exercise our discretion to engage in *de novo* review "only in exceptional cases"). Consequently, we defer to the juvenile court's explicit findings of historical fact if those findings are supported by any evidence in the record, and we assume that the juvenile court implicitly found predicate facts necessary to support its disposition. *Dept. of Human Services v. S. S.*, 278 Or App 725, 727, 375 P3d 556 (2016). We then "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit" the juvenile court's change to the permanency plan. *Dept. of Human Services v. T. M. S.*, 273 Or App 286, 288, 359 P3d 425 (2015) (internal quotation marks and brackets omitted). We state the facts in accordance with that standard.

This consolidated appeal involves mother's three children, D, B, and S. At the time of the permanency hearing, the children were nine years old, two years old, and one

year old, respectively. D and B have different legal fathers; S has no legal father.

DHS became involved with the family in July 2014. At that time, D and B were living with mother and B's father (S was not yet born). D's father lived in another city and had not been in touch with D for several years. That month, DHS received a report that a child was seriously injured while in mother's care. Based on that incident, mother was arrested and charged with criminal mistreatment of a minor. DHS implemented a safety plan in which mother agreed to have no contact with D and B except as supervised by DHS, and B's father agreed to care for both children. DHS also contacted D's father, who agreed to the safety plan.

In August 2014, DHS received a report that mother had been cited and released for shoplifting. During mother's interaction with police, she admitted to having drug paraphernalia in her possession and that she had recently relapsed on heroin. DHS referred mother to drug-treatment services that month. Mother independently contacted a treatment center, and in September, she submitted to a drug and alcohol assessment with Loveless, a contracted provider for DHS. Loveless determined that mother qualified for residential treatment. Mother did not engage in such treatment, and, in the fall of 2014, mother was incarcerated.[1] After mother was incarcerated, Loveless met with mother twice in order to "work through [mother's] resistance to engagement in treatment." According to Loveless, mother did not believe that she needed drug treatment but nonetheless wanted to engage in it in order to satisfy DHS.

In August 2014, DHS referred B's father to drug-treatment services. In September 2014, B's father tested positive for marijuana and methamphetamine, and he reported that he was experiencing withdrawal symptoms due to heroin use. DHS then placed D and B in protective custody.

In October 2014, the juvenile court asserted jurisdiction over D and B. With respect to mother, the court found that "mother's substance abuse interferes with her ability to

---

[1] The record shows that mother was in and out of custody between August 2014 and the summer of 2015, but the precise dates of incarceration and house arrest during that period are not clear from the record.

safely parent" and mother admitted that she "is currently incarcerated and unable to be a parenting resource."[2] The court ordered the parents to comply with letters of expectations issued in October 2014.[3] Those letters required all three parents to complete drug and alcohol evaluations and all recommended treatment, maintain contact with the family's caseworker, engage in services with the Addiction Recovery Team (ART), follow DHS visitation guidelines, attend all court hearings, and provide DHS with certain releases.[4]

Mother gave birth to S while she was subject to house arrest in March 2015.[5] Shortly thereafter, the juvenile court asserted jurisdiction over S based on mother's admission to allegations that she "has substance abuse issues that interfere with her ability to safely parent the child" and that "[t]here is no legal father." In the spring of 2015, D, B, and S were placed in foster care with their maternal aunt in Colorado.

In April 2015, the family's caseworker documented that mother "continues to express empathy for her children" and had acknowledged that "her drug use has impacted her children and their safety." At that time, mother reported having video visits with D and B on a weekly basis. The caseworker noted that the parents had not "made progress" in the case and that D's father and B's father were not in contact with DHS. The caseworker also documented nearly

---

[2] B's father admitted to allegations that he "is in need of the assistance of the State to safely parent [B]" and that he "has substance abuse issues that interfere with his ability to safely parent." D's father admitted that he "does not have legal custody of [D] and is unable to protect [D] from the mother." In addition, the juvenile court found that D's father "has substance abuse issues that interfere with his ability to safely parent," "has had limited contact with [D]," and "has a limited parenting relationship with [D]."

[3] A "letter of expectations" refers to "an individualized written statement for the family of the child * * * that identifies family behaviors, conditions, or circumstances that resulted in an unsafe child; the expected outcomes; and what [DHS] expects each parent or guardian will do to achieve safety, permanency, and well-being of the child * * * in the parental home." OAR 413-040-0010(7)(b).

[4] The court additionally ordered D's father and B's father to submit to random drug testing and psychological evaluations, engage in mental health counseling, and maintain suitable "independent housing."

[5] Mother was placed on house arrest while she awaited trial for her criminal-mistreatment-of-a-minor charge.

weekly face-to-face contact between DHS and mother for the preceding six months.

In the late spring or early summer of 2015, DHS assigned a new caseworker, Moles, to work with the family. When Moles took over the case, the last documented face-to-face contact between DHS and mother had occurred in April 2015. Moles was a graduate student who was only available to work two days per week for DHS, but she nonetheless carried a full-time caseload. Moles continued to serve as the family's caseworker until the March 2016 permanency hearing.

While mother was subject to house arrest, she informed Moles that she was attending drug treatment and was subject to random drug tests. Mother reported having phone contact with her children "daily" and video visits with the children when she was able. DHS arranged for the ART to work with mother while she remained subject to house arrest, but those services were not provided before mother's June 2015 arrests for assault, criminal mistreatment, and unlawful possession of methamphetamine and heroin. Mother was incarcerated from that point forward, and, in October 2015, she started serving a prison sentence at Coffee Creek Correctional Facility. In December 2015, Moles contacted mother's prison counselor for the first time and sent mother an "action agreement" that, among other things, listed the court-ordered services in which mother was required to participate.[6] For the first eight months of mother's incarceration, despite mother's requests, DHS did not provide financial assistance to mother for video and telephone visits with her children.[7] In a case plan dated January 2016, Moles documented no face-to-face contact with mother for the preceding six months.

---

[6] An "action agreement" is a time-limited agreement between DHS and the parent, which includes at least "one of the expected outcomes in the case plan," the "specific activities or services required to achieve the expected outcome," the "[p]articipants and responsibilities of each participant," the "[a]nticipated start and completion dates," the method by which progress will be measured, a "timeline for review," and, when appropriate, "identification of an order of the court that relates to the expected outcome or specified activities or services." OAR 413-040-0011.

[7] In February 2016, DHS sent B's father a letter offering "Skype/Telmate visits" and sent D's father a letter stating that DHS was "working on Skype/Telmate visits." The record does not show that D or B had video visits with their respective fathers prior to the permanency hearing.

The juvenile court held a permanency hearing on March 29, 2016. At the time of the hearing, the children had been living with their aunt for approximately one year. D and B had been in substitute care for more than 18 months, and S had been in substitute care for one year. Aunt described D as a "very bright child" who did well in school but struggled with some aggressive behavior and anxiety. According to aunt, B was "doing really well" despite some delays in his speech and walking, and S was "doing awesome." At the time of the hearing, all three parents were incarcerated. Mother was anticipating release in November 2016, contingent upon her completion of an intensive, residential drug-treatment program.

At the permanency hearing, DHS requested that the plans for all three children be changed from reunification to guardianship because the agency did not expect the parents to achieve reunification within a reasonable time and, in the agency's view, adoption was not an appropriate permanency plan under the circumstances. All three parents opposed the department's request, arguing, among other things, that the department had not made reasonable efforts to make reunification possible.

Moles, the only caseworker to testify at the hearing, testified that, before she was assigned to the case, other DHS workers had provided the following services to the parents:

> "[D]rug and alcohol [sic], *** various letters of expectation[s] and action agreement[s], encompassing contact with the case worker, *** how to maintain contact with your DHS case worker, how to receive information on your children, what do supervised visits look like with your children, *** how you can receive services through [DHS], maintain contact with your parole or probation officer, just to name a few."

Addressing her own efforts, Moles testified that she sent mother "letters of expectation[s], as well as action agreements."[8] Moles testified that mother had "been in great

---

[8] At the hearing, DHS provided three letters of expectations that were sent to mother, dated October 2014, January 2015, and April 2015. None of the letters

contact" with DHS, had left "numerous messages," and had requested help in arranging and paying for phone and video visits with the children "throughout the duration of th[e] case." Moles acknowledged that, for the first eight months of mother's incarceration, DHS did not provide financial assistance to mother for telephone and video visits, and, instead, mother and aunt had paid for the visits. Moles further testified that, although it would have been "helpful" to have an updated psychiatric evaluation for mother, Moles had not made efforts to arrange for one after learning that mother's previous evaluator had retired.

Moles acknowledged that, due to her schedule, there were "a lot of things that didn't get done as timely," and that working conditions at DHS were "difficult." Moles "believe[d] that when a person is incarcerated, it's up to them, as well as their counselor, where they're at in the program, to get into *** services." She testified that DHS's obligation was to "make referrals," "let [the parent] know what's expected," engage in written correspondence with the parent, and "coordinat[e] *** care with counselors." With respect to the delay in setting up video visits, she "agree[d]" that it was "not fair to the parents, and not fair to the kids." She testified that she had an "in depth" conversation with mother about DHS's expectations upon release, but that she and mother had not formed a concrete plan as to how mother would meet those expectations.

Mother testified at length about her participation in substance abuse and parenting programs at Coffee Creek. She also testified about her frequent contact with all three children since entering prison, including writing letters, weekly telephone calls, and several video visits. Regarding her contacts with DHS, mother testified that she had had biweekly calls with Moles in the "last couple [of] months" before the hearing, but that, before that, "it had been quite a struggle." As far as mother was aware, DHS never made an effort to arrange an in-person visit for the children, nor did DHS offer financial assistance for an in-person visit.

---

were signed by Moles. DHS also provided one action agreement sent to mother by Moles in December 2015.

Mother's prison counselor, Calvert, also testified at the hearing. He stated that DHS had contacted him four times "inquiring about visitation and eligibility." Calvert had been working with mother since November 2015 and described mother as "eager and wanting to learn." In his view, mother was making the best of her time in prison, as she had effectively advocated for herself in order to gain entrance into an alternative incarceration program, parenting classes, and substance abuse support groups. According to Calvert, mother was approved to enter an intensive, residential-treatment program as part of the alternative incarceration program, which would allow her to be released as early as November 2016. He also testified that mother felt that drug treatment was "extremely important" in order for her to become a "better parent" upon release.

The juvenile court changed the permanency plan from reunification to a durable guardianship. *See* ORS 419B.366(5);[9] *L. D. v. T. J. T.*, 274 Or App 430, 440 n 4, 360 P3d 746 (2015) (noting that the term "durable guardianship" is not found in ORS 419B.366, but that we use the term "to distinguish a guardianship established under that statute from a permanent guardianship * * * and from a guardianship as an incident of wardship"). The court adopted DHS's description of its efforts at reunification as found in Section 8.1 of the uniform court report prepared by DHS.[10] The

---

[9] ORS 419B.366(5) provides that a court may grant a motion for guardianship if the court determines, after a hearing, that:

"(a) The ward cannot safely return to a parent within a reasonable time;

"(b) Adoption is not an appropriate plan for the ward;

"(c) The proposed guardian is suitable to meet the needs of the ward and is willing to accept the duties and authority of a guardian; and

"(d) Guardianship is in the ward's best interests. In determining whether guardianship is in the ward's best interests, the court shall consider the ward's wishes."

[10] Section 8.1 listed the following pertinent efforts by DHS: "Referrals to [d]rug and [a]lcohol evaluation[s] and all recommended treatment"; "Random [drug tests] through DHS"; "Scheduled visitations"; "Skype visits while incarcerated"; "Psychological evaluation[s] and any recommended services"; and "Referrals for [m]ental [h]ealth counseling." Most of the items listed in Section 8.1 of the report do not refer to efforts that DHS actually made, but instead, were actions that were expected of the parents, including: "Maintain contact with your caseworker and provide any changes in address or telephone"; "Maintain independent housing that is clean and safe and appropriate for your child"; "Sign

introductory section of that report provides a clearer description of DHS's purported efforts on behalf of mother, stating that "DHS continues to maintain at least monthly contact with the parents"; "DHS referred [mother] to the ART program however she did not engage in or complete the program"; and "DHS provided Telmate visitation for [mother] between her and her children."[11]

The court also made oral findings that were incorporated into the permanency judgment. The court first addressed whether DHS had made reasonable efforts to reunify the family:

"[W]hile incarceration does not relieve [DHS] from providing the services that [are] required to be done, * * * the Court does find that [DHS] has made reasonable efforts. [DHS] has done all that [it] can do in terms of contacting—they can't specifically provide services while parents are incarcerated. They can contact the counselors which they've done. In each of the cases, contacted the particular counselors for each of the parents and * * * encouraged the counselor and done whatever they can do both with the parent and with the counselor to provide the services that need to be met in order * * * for the parent to be in the circumstance where they can safely provide for their child, provide a healthy and safe environment for their child. That's been done by [DHS] * * * and continues to be done to this date.

"* * * In a period of three months there were eight different contact[s] with the counselor trying to encourage the counselor to provide the necessary services * * *. So * * * from the Court's perspective, services have been provided, all that they can provide while the parents are incarcerated."

The court did not expressly make individualized reasonable-efforts findings with respect to each parent.[12]

---

release of information forms for all service providers"; and "Follow all rules at your correctional facility and attend as many services [as] are offered to you."

[11] This list of efforts was the same as a list included in a November 2015 report prepared for a different hearing.

[12] For the most part, the juvenile court also did not expressly address whether individual parents had made "sufficient progress" toward reunification. The court stated that the parents were "on track," but that "the circumstances are not such that the parents can, within a reasonable period of time, fix their circumstances." According to the court, the children "need to move on with their

The court described DHS's "reasonable efforts" as involving "drug and alcohol evaluation[s], making referrals for counseling, making referrals for dealing with [the parents'] addiction issues," while noting that the parents had "put themselves in a situation [in which] they ended up in custody where they can't have access to their child, and the only way services can be provided is through the Department of Corrections." The court acknowledged that mother had maintained an "ongoing relationship with her sister," which had "encourag[ed]" the relationships between the children and their parents. The court stated that it was "encouraging" parents to continue to have a "connection" with the children, and that it was "encouraging" their guardians to help foster that connection.

## ANALYSIS

When the permanency plan at the time of a permanency hearing is reunification, the juvenile court is authorized to change the plan away from reunification only if DHS proves that (1) it made reasonable efforts to make it possible for the child to be reunified with his or her parent and (2) notwithstanding those efforts, the parent's progress was insufficient to make reunification possible. ORS 419B.476(2)(a); *Dept. of Human Services v. R. B.*, 263 Or App 735, 745, 329 P3d 787 (2014). DHS has the burden of proving both prongs by a preponderance of evidence. *Id.* In deciding whether to change the permanency plan away from reunification, the juvenile court must treat the child's "health and safety [as] paramount concerns." ORS 419B.476(2)(a).

The reasonableness of DHS's efforts depends upon "the particular circumstances" of each case. *State ex rel Juv. Dept. v. Williams*, 204 Or App 496, 506, 130 P3d 801 (2006). DHS must make reunification efforts directed at each parent, *Dept. of Human Services v. T. S.*, 267 Or App 301, 310, 340 P3d 142 (2014), and the juvenile court must evaluate those efforts through the lens of the "adjudicated bases for jurisdiction," *S. S.*, 278 Or App at 738; *see also Dept. of Human Services v. N. T.*, 247 Or App 706, 715, 271 P3d 143 (2012) ("The particular issues of parental unfitness

---

li[ves]," and the "health of the children dictates that they need to have some permanency," which, in the court's view, guardianship would provide.

established in the jurisdictional judgment provide the framework for the court's analysis of each question—that is, both DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction."). DHS's efforts are reasonable within the meaning of ORS 419B.476(2)(a) only if DHS has given the parents a "reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Dept. of Human Services v. M. K.*, 257 Or App 409, 417, 306 P3d 763 (2013) (internal quotation marks omitted). Consequently, DHS's efforts are evaluated over the entire duration of the case, "with an emphasis on a period before the hearing 'sufficient in length to afford a good opportunity to assess parental progress,'" *S. S.*, 278 Or App at 735 (quoting *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 426, 180 P3d 39 (2008)).

It is well established that DHS is not excused from making reasonable efforts toward reunification simply because a parent is incarcerated. *Williams*, 204 Or App at 506 ("[I]ncarceration of a parent, without more, is not an aggravated circumstance that may serve as a basis for excusing DHS from making reasonable efforts toward reunifying the family."). When assessing DHS's efforts, a juvenile court properly considers "the length and circumstances of a parent's incarceration," *see Dept. of Human Services v. S. W.*, 267 Or App 277, 293-94, 340 P3d 675 (2014), and "evidence specifically tied to [a parent's] willingness and ability to participate in services," *see Dept. of Human Services v. J. M.*, 275 Or App 429, 449, 364 P3d 705 (2015), *rev den*, 358 Or 833 (2016). At the same time, the reasonable-efforts inquiry focuses on DHS's conduct, and a parent's resistance to DHS's efforts does not categorically excuse DHS from making meaningful efforts toward that parent. *Dept. of Human Services v. R. W.*, 277 Or App 37, 44, 370 P3d 543 (2016).

Mother assigns error to the trial court's conclusion that DHS made reasonable efforts for several reasons. Mother points out that, after she became incarcerated in the summer of 2015, DHS failed to make any efforts on her behalf until Moles contacted mother's prison counselor in December 2015. Mother also points out that DHS provided

no assistance in arranging and paying for phone and video visits until just prior to the permanency hearing, that DHS made no efforts whatsoever to arrange in-person visits with the children, and that Moles did not have frequent contact with mother until the last couple of months before the permanency hearing.[13]

DHS responds that its efforts were reasonable, pointing to mother's early resistance to drug treatment and the agency's attempt to provide addiction-recovery services to mother while she was subject to house arrest. DHS further argues that Moles's contact with mother and mother's prison counselor after December 2015, along with DHS's early efforts, is enough to render DHS's overall efforts reasonable, despite the periods of inaction.

In support of the permanency judgment, DHS relies on *S. W.*, in which we held that the record contained sufficient evidence to support a conclusion that DHS had engaged in reasonable efforts on behalf of an incarcerated parent, despite lengthy periods of inaction by the agency. 267 Or App at 294-95. In that case, the child had "severe physical problems" and emotional problems, and the juvenile court took jurisdiction over the child based on the father's substance-abuse problems and his incarceration. *Id.* at 279-80. Early in the case, the agency facilitated the father's transfer from prison to a substance-abuse treatment program and transported him to the treatment facility. *Id.* at 280. While the father was in the treatment program, DHS arranged for the child to visit the father three times, encouraged the father to participate in substance abuse support groups, and the ART met with the father five times. *Id.* The father responded by showing a lack of interest in participating in the substance abuse support groups, failing to stay in contact

---

[13] Mother makes two additional assertions in support of her argument. For one, mother asserts that DHS did not respond to her requests for help in pursuing outpatient treatment while mother was subject to house arrest. However, Moles testified that DHS had arranged for the ART to work with mother during that time period, but that mother was arrested before services could be provided. Second, mother asserts that, other than the initial drug and alcohol assessment in the fall of 2014, Loveless made "no further attempts to engage with mother." Yet, Loveless testified that she followed up with mother twice. Viewing the record in the light most favorable to the juvenile court's judgment, mother's framing of the facts in both respects is not supported by the record.

with DHS after his release from treatment, and forgoing an opportunity to visit his child at DHS's expense. *Id.* at 280-81. The father then committed new crimes and started serving a lengthy period of incarceration. *Id.* Over the 33-month period between the father's arrest and the permanency hearing, DHS sent the father letters of expectations, called him twice, met with him once in person, encouraged him to send letters to the child, delivered his letters, and arranged for a psychological evaluation. *Id.* at 289-90. Although we noted that DHS's efforts during that time period were "hardly vigorous," we concluded that DHS's efforts over the life of the case were reasonable based in part upon DHS's significant efforts at the beginning of the case to encourage father to engage in treatment and develop a relationship with his child. *Id.* at 290-93. We reasoned that the juvenile court could, in its reasonable-efforts determination, permissibly consider the length and circumstances of father's incarceration, the fact that he was aware of what DHS expected of him, and whether, in light of father's response to DHS's efforts and his child's special needs, additional efforts would have materially improved the jurisdictional bases. *Id.* at 291-93. Accordingly, based on the particular circumstances of the case—including a body of evidence from a period of several years tied to father's willingness and ability to benefit from additional services—we concluded that sufficient evidence supported the juvenile court's reasonable-efforts determination. *Id.* at 293-95; *see also J. M.*, 275 Or App at 449 (reasoning that the juvenile court properly considered "evidence specifically tied to [the] parents' willingness and ability to participate in services" when assessing whether DHS's failure to provide specific services rendered its efforts over the life of the case unreasonable).

The result in *S. W.* was heavily fact dependent, and it should not be taken to mean that we will readily excuse the department's failure to engage with parents simply because they are incarcerated or fail to immediately respond in a desirable manner to DHS's efforts. Here, as in *S. W.*, the record shows that DHS made efforts at the beginning of the case to engage with mother and provide services to her to address her substance-abuse problems. And, like the father in *S. W.*, mother was resistant to DHS's early efforts

insofar as she expressed that she did not think she needed treatment and failed to initially participate in treatment. Yet, the record also shows that mother, unlike the father in *S. W.*, maintained regular contact with her children throughout the life of the case and, as early as the spring of 2015, acknowledged that her drug abuse harmed and endangered her children. *Cf. S. W.*, 267 Or App at 293-94 (finding significant the fact that father had only requested contact with his child once over a 33-month period). In addition, while subject to house arrest, mother engaged in drug treatment, and although she relapsed and committed new crimes in the summer of 2015, she continued to independently maintain close contact with her children while incarcerated, despite DHS's failure to respond to her requests for assistance in facilitating phone and video visits. Thus, while mother was demonstrably willing to engage in services following her arrest in the summer of 2015, DHS did not meet mother's efforts in kind, instead placing responsibility for the family's case in the hands of a part-time caseworker, Moles, who, by her own admission, did not timely provide services to mother due to her full-time workload at DHS.

Consequently, unlike in *S. W.*, the trial court lacked sufficient evidence to support a conclusion that mother would not have benefited from additional services or that DHS had done "all that [it] can do" with respect to mother. To the contrary, mother continued to demonstrate that she wanted to reunify with her children, despite her own missteps and failures connected to her struggles with addiction. Mother advocated for herself and took advantage of many services in prison, yet DHS did not even contact mother's prison counselor until December 2015 to find out what services were available to mother.[14] *Cf. H. S. C.*, 218 Or App at 426-27 (finding a lack of reasonable efforts in part because DHS had not inquired into the services that were available to the father while he was in immigration detention). Due to mother's own efforts, she anticipated potential release from prison roughly seven months after the permanency hearing, yet, at the time of the hearing, DHS had not even formed a

---

[14] Although the juvenile court adopted DHS's statement that it maintained "monthly contact" with parents, there is insufficient evidence in the record to support the accuracy of that finding over the life of the case.

concrete plan with mother as to how she would work toward reunification following her release. Mother's conduct—specifically, her willingness to participate in services and her desire for contact with her children and DHS—demonstrates that additional efforts by DHS could have materially contributed to the goal of ameliorating the jurisdictional bases. *See M. K.*, 257 Or App at 418-19 (holding that the reasonableness of DHS's efforts requires weighing "the extent to which the family might benefit" from a particular service against the burden of providing that service); *N. T.*, 247 Or App at 715 ("[B]oth DHS's efforts and a parent's progress are evaluated by reference to the facts that formed the bases for juvenile court jurisdiction."). *Cf. S. W.*, 267 Or App at 293 (concluding that, even if additional contact between the father and his child "would have been desirable," the father failed to explain why additional contact "would have materially advanced his ability to reunify with [his child]").

Moreover, there is no evidence in this case that DHS's inaction for lengthy periods of time was the product of a reasoned decision to cease certain efforts—instead, the record reveals that DHS failed to adequately engage with mother because it did not allocate sufficient resources to the family's case. Because DHS took so few meaningful steps to even become aware of mother's participation in services while incarcerated (let alone support mother's efforts), we cannot conclude that the record was sufficient to support the trial court's determination that DHS made reasonable efforts over the life of the case.

Our recent decision in *S. S.* further supports our conclusion. In *S. S.*, we held that there was insufficient evidence to support the trial court's reasonable-efforts determination because, even assuming that DHS engaged in reasonable efforts for the four months leading up to the permanency hearing, DHS failed to engage in adequate efforts for the six months preceding that four-month period. 278 Or App at 738. One of the jurisdictional bases in that case was that the mother needed DHS's assistance to reestablish a relationship with her children, and for six months, upon a therapist's recommendation, DHS had prevented the mother from corresponding or having visitation with her

children. *Id.* at 730-31, 738. After the juvenile court ordered DHS to work toward rebuilding the mother's relationship with her children, a therapist spent four months preparing one of the children for contact with the mother. *Id.* at 731-32. Despite DHS's efforts during that time, we concluded that four months was an insufficient period of time to permit the court to "meaningfully assess" whether the family was making sufficient progress in light if DHS's preceding failures. *Id.* at 737.

Mother argues that, here, DHS's efforts at various stages of the case were insufficient to compensate for its lengthy period of inattention, and that the increased efforts by Moles in the months before the hearing did not provide mother a reasonable opportunity to demonstrate the ability to adjust her behavior in a way that would make reunification possible.

DHS attempts to distinguish this case from *S. S.*, pointing out that, in *S. S.*, DHS actively prevented the mother from contacting her children, whereas in this case, DHS did not obstruct mother's contact with her children. Be that as it may, the fact that DHS did not actively interfere with mother's ability to contact her children is not determinative of whether DHS engaged in reasonable efforts to ameliorate the jurisdictional bases. With respect to mother, the bases for jurisdiction were that she had substance-abuse problems and was incarcerated, not that she lacked a relationship with her children. That mother was able to maintain regular contact with her children over the life of the case tells us nothing about whether DHS made reasonable efforts to help mother address her substance-abuse problems. As in *S. S.*, even assuming that DHS made reasonable efforts to ameliorate the jurisdictional bases in the months leading up to the permanency hearing, we cannot conclude that the months in which DHS did make efforts amounted to a sufficient period of time in which the court could meaningfully assess whether mother was making sufficient progress toward reunification.

Because we conclude that there was insufficient evidence to support the juvenile court's determination that DHS made reasonable efforts with respect to mother, we

reverse the permanency judgments for D, B, and S. In light of that disposition, we need not resolve whether there was legally sufficient evidence to support the juvenile court's reasonable-efforts determination with respect to the fathers.[15] *Cf. R. W.*, 277 Or App at 45-46 (reversing and remanding to the juvenile court for correction of its reasonable-efforts determination because the determination continued to have operative legal effect).

Reversed and remanded.

---

[15] Our disposition also obviates the need to address whether the juvenile court incorrectly concluded that mother had not made sufficient progress toward reunification.