Argued and submitted January 17, reversed and remanded April 8, 2020

In the Matter of S. N. C.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. C. C.,
*Appellant.*

Lane County Circuit Court
18JU02544; A171979

463 P3d 592

Father appeals from a permanency judgment that changed the plan for his child from reunification to adoption. Father argues that the juvenile court erred in concluding that the Department of Human Services (DHS) had proved that it made reasonable efforts to reunify father and his child, a required predicate to changing a child's permanency plan away from reunification. Because he will be incarcerated in federal prison for many years, father's argument focuses on DHS's failure to facilitate placing his child with father's sister in Georgia, who was willing and able to be a permanent resource for the child. *Held*: Father's incarceration and the fact that his care resource for his child is located in another state might make providing reasonable efforts more challenging and time-consuming, but that does not excuse DHS from making reasonable efforts for reunification before obtaining a change in the child's plan to adoption. Here, DHS did not demonstrate that it had made those reasonable efforts by the time of the permanency hearing.

Reversed and remanded.

Jay A. McAlpin, Judge.

Holly Telerant, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Benjamin Gutman, Assistant Attorney General, argued the cause for respondent. Also on the brief was Ellen F. Rosenblum, Attorney General.

Before Ortega, Presiding Judge, and Shorr, Judge, and James, Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

Father appeals from a permanency judgment that changed the plan for his child, S, from reunification to adoption. Father is incarcerated in federal prison, and his resulting unavailability as a custodial resource for S is the sole basis for the juvenile court's exercise of jurisdiction over S, as to father. Father argues that the juvenile court erred in concluding that the Department of Human Services (DHS) had proved that it made reasonable efforts to reunify father and S, a required predicate to changing a child's permanency plan away from reunification. Because he will be incarcerated for many years, father's argument focuses on DHS's failure to facilitate placing S with father's sister in Georgia, who was willing and able to be a permanent resource for S.

We conclude that DHS indeed failed to make reasonable efforts. Father's incarceration and the fact that his care resource for S is located in another state might make providing reasonable efforts more challenging and time-consuming, but do not excuse DHS from making reasonable efforts before obtaining a change in S's plan from reunification to adoption. Here, DHS did not demonstrate that it had made reasonable efforts with father by the time of the permanency hearing. Accordingly, we reverse and remand.

Father does not ask us to take *de novo* review, and we decline to do so. ORAP 5.40(8). The juvenile court's determination that DHS made reasonable efforts is a legal conclusion that we review for errors of law. *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 133, 413 P3d 1005 (2018). "In conducting that review, we are bound by the juvenile court's explicit factual findings if there is evidence to support those findings." *Id.* We also "presume that the court made any necessary implicit factual findings in a manner consistent with its ultimate legal conclusion." *Id.* "However, '[i]f an implicit factual finding is not necessary to a trial court's ultimate conclusion or is not supported by the record, then the presumption does not apply.'" *Id.* (quoting *Pereida-Alba v. Coursey*, 356 Or 654, 671, 342 P3d 70 (2015)).

Father has been incarcerated since September 2017 and has been at the federal prison in Sheridan, Oregon, since about October 2017. At the time of the hearing in this

case in June 2019, father had not yet been sentenced, but the range of his potential sentence was seven to 20 years.

S was born in November 2017 with signs of drug withdrawal, which prompted DHS's involvement. Following S's birth, mother entered an inpatient substance abuse treatment facility with S for a "couple of months." After mother failed to follow through with treatment, in March 2018, DHS filed a dependency petition for S. In April 2018, the juvenile court took jurisdiction over S based on mother's and father's admissions.[1] With respect to father, the court took jurisdiction because "father is incarcerated and unavailable to be a custodial resource." Mother's last contact with S was in June 2018. Mother was briefly in contact with DHS in March 2019 but otherwise has not had any contact with DHS since June 2018.

Mother and father always maintained father's paternity of S. However, in September 2018, over five months after DHS filed the dependency petition, DHS learned that mother was married to another man at the time of S's birth and that father was not listed on S's birth certificate. Upon being contacted, mother's husband denied having any in-person contact with mother in the last five years, and DHS obtained a judgment of nonpaternity for him in November 2018. However, it was not until January 2019 that DHS requested a DNA swab from father for a paternity test. That test was further delayed because the federal prison did not have an authorized person to take the DNA swab, and DHS did not attempt to make other arrangements for obtaining a swab. In April 2019, father arranged for his federal attorney to obtain a swab from him during a visit and return it to the lab for testing. Father's paternity of S was confirmed April 25, 2019.

During the approximately 15 months between the court taking jurisdiction of S and the permanency hearing, three different caseworkers have been assigned to the case since intake and S has had four placements. The first

---

[1] With respect to mother, the juvenile court took jurisdiction based on mother's admissions that her "substance abuse interferes with her ability to safely parent," and her "chaotic lifestyle and residential instability interferes with her ability to safely parent." Mother is not a party to this appeal.

caseworker, Denney, was assigned to the case for about five months; the second caseworker, Shepherd, was assigned to the case for about six months; and the third caseworker, Gould, was assigned to the case for the two months before the permanency hearing. As to placements, after S was removed from mother's care, she was placed with her maternal aunt for about two months, but was removed because the aunt had unauthorized people in the home. S was then placed in nonrelative foster care for about three months, and then with a paternal relative for about three and one-half months, but was removed when S sustained a serious head injury. Finally, S was placed back with the same nonrelative foster care for the six months before the hearing.

Since the beginning of the case, father has expressed to DHS his wish that his sister, Collins, should take custody of S. Father is African-American, and S's mother is white. S's foster parents are also white. Father feels strongly that it is important that S is raised in an African-American family for many reasons, and he has communicated those concerns to DHS. Collins lives in Georgia and has been in contact with DHS since August 2018 about taking custody of S. DHS, however, was unwilling to consider an out-of-state placement while the case plan was reunification.

In early January 2019, DHS did ask for information from Collins, and she submitted the documentation needed to pursue S's placement with her through an Interstate Compact on the Placement of Children (ICPC). After DHS told Collins about its questions regarding father's paternity, Collins agreed that she wanted to find out the results of the paternity test; however, she never asked DHS to put the process of placing S with her on hold for that reason. Gould confirmed in her testimony that it was DHS that chose not to go forward with the placement without first confirming paternity—and indeed, DHS did not move forward with the ICPC request until after the DNA results, which father facilitated obtaining, confirmed his paternity in April 2019. Georgia received the ICPC paperwork from Oregon on June 7, 2019—about one and one-half weeks before the scheduled permanency hearing and 14 months after the court took jurisdiction—and Collins received the initial contact from Georgia around the same time that the hearing was being held.

With regard to contact between Collins and S, the first two DHS caseworkers declined to set up phone or video contact between Collins and S as Collins requested, citing S's age and medical issues. In May 2019, about one month before the permanency hearing, the third caseworker, Gould, gave Collins a phone number for S's foster mother so that Collins and S could have contact. Collins and S's foster mother arranged to have a video call with S before the hearing, but that call had to be cancelled due to S's foster mother having difficulties with her phone and due to Collins having to attend to a family medical emergency the same day. Collins had not yet rescheduled that call with S's foster mother because she wanted to get more information after Gould told her that it was in DHS's discretion whether she could have contact with S.

Father testified at the hearing that he continues to want S to be placed with Collins in Georgia. He also testified that, after he is sentenced, he can request a transfer to a federal prison that is close to her. Gould testified that DHS will not place S out of state as long as the plan remains reunification.

With regard to other efforts, the first caseworker, Denney, arranged for two in-person visits between father and S, in May and June 2018, but after some "inappropriate" language from father in emails to both the nonrelative foster parent and to the caseworker, Denney directed that father only communicate with DHS through his attorney and did not facilitate another in-person visit between father and S. Denney also provided a letter of expectation to father in August 2018. Father reported to Denney the services that he completed while in prison, which included a parenting class and an anger management class.

The next caseworker, Shepherd, did not attempt to arrange visitation between father and S, and father found it difficult to communicate with him. Starting in January 2019, father began having phone calls with S twice a week, which he and S's foster parent arranged. In February 2019, Shepherd sent father a second letter of expectation.

The last caseworker, Gould, had been assigned to the case for two months at the time of the permanency

hearing. In that time, she arranged for one in-person visit between father and S and was planning a second one later that month. Gould, the only caseworker to appear at the hearing, testified that it was very difficult to contact and obtain information from father's prison counselor and that DHS could not initiate calls to father at the prison, so communication was primarily by email. Gould also testified that she had no idea what services were available to father in prison and that she had no information what services he had completed other than a list of services that father's attorney had given her. She also testified that father has been cooperative with DHS, is responsive with information, and has followed through appropriately in trying to find placements for S. Father also has reportedly been appropriate and engaged with S in his in-person and phone visits with her.

At the close of the hearing, father argued that DHS had not proved that it made the required reasonable efforts to change S's permanency plan from reunification to adoption and that the court should deny DHS's request for the change in plan.

With respect to reasonable efforts, the juvenile court found and concluded as follows:

"So I do find that DHS has made reasonable efforts. There were three factors in the problems that [father's attorney] has brought up. We had the most evidence about two of those, which probably is the least—probably the least important but are also factors. So there's ample evidence that [the] Sheridan [prison] was difficult to work with and to arrange things with, and so that certainly caused some delay.

"Can't expect to have unsupervised visits if you're incarcerated. You can't expect to have daily visits if you're in another county. Right? Those are—there are just some practical considerations that have to be worked around. And how willing the facility is to work with DHS and the foster parent plays a factor in that. And the evidence is that [the] Sheridan [prison] was difficult to work with.

"The other factor is there's some evidence that [father] played a role in there being problems. He—I would say he was colorful with DHS. He was rude and combative,

and when you have someone who is rude and combative, it decreases the amount of people who can go and do the supervised visits. And he was the same way with the foster parents ***.

"*****

"The third factor and probably the biggest factor is the caseworker's willingness to push through all those things and get there. I think Ms. Gould has done an exceptional job in doing that. Some of the other caseworkers may have done a less exceptional job, but I have less testimony about that and less evidence. I don't know what their motivations were or why that was.

"*****

"But what we have here is communication with [father], visits with [father]. Probably not as much—certainly not as much as he would want. Maybe not as much as would be optimal. But considering the barriers, two of which we have evidence of, I can't say they were unreasonable.

"Also, there was the period of time where there were the—[father's] family being the foster parents, and I think that has to be accounted for because there certainly was something going on there that was not particularly good, and I think that goes towards DHS's efforts. And then they have to stop and investigate that and try to walk back any damage that was done by that in that case of time, as well.

"So I do find that DHS has made reasonable efforts. Maybe not optimal efforts, but they have made—maybe not active efforts if this was an ICWA case, but they made reasonable efforts."

The juvenile court entered a permanency judgment changing S's plan from reunification to adoption.

On appeal, father again argues that DHS failed to prove that it had made reasonable efforts sufficient to change the plan for S from reunification to adoption. Father argues that whether DHS made reasonable efforts must be assessed in light of the jurisdictional basis, which was that father's incarceration made him unavailable as a custodial resource. Under that view, father asserts, DHS's efforts were not reasonable because they did not afford father a reasonable opportunity to enlist a caregiver for S; that is, father

argues that DHS's efforts did not, "at the time of the permanency hearing, provide a long enough period to determine whether father, by delegating much, if not all, of his parental authority to [Collins], could be a minimally adequate parent to [S]." Father also asserts that DHS's choice to put up roadblocks to placing S with Collins was not reasonable.

DHS responds that the juvenile court correctly found that it had made reasonable efforts, because DHS gave father an opportunity to find a custodial home for S when it placed her with a paternal relative who lived locally, although that placement was not successful. DHS also argues that it made reasonable efforts with respect to father's proposal to place S with Collins in light of the barriers to proceeding with that placement, namely, that S's doctor recommended in January 2019 that she not be moved, that Collins wanted father's paternity confirmed, and that DHS would not consider out-of-state placement while S's plan remained reunification. DHS argues that its reasonable efforts with respect to Collins were to facilitate setting up a video call between Collins and S and to initiate the ICPC process so that Collins could be considered as an adoptive resource. DHS also argues that delays in this case with regard to the DNA test or difficulties in arranging visits with S were due to father's imprisonment and father's inappropriate communications, and not to a lack of reasonable efforts by DHS.

Under ORS 419B.476(2)(a), to change S's permanency plan from reunification to adoption, "the juvenile court was required to make two predicate determinations: (1) that DHS made 'reasonable efforts' to reunify [S] with father; and (2) that, notwithstanding those efforts, father's progress was not sufficient to permit reunification."[2] *L. L. S.,*

---

[2] ORS 419B.476(2)(a) provides:

"At a permanency hearing the court shall:

"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts or, if the Indian Child Welfare Act applies, active efforts to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

290 Or App at 138. Reasonable efforts are "efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give 'parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents.'" *Id.* (quoting *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 306, 388 P3d 1204 (2017) (internal quotation marks omitted)); *see also Dept. of Human Services v. V. A. R.*, 301 Or App 565, 571, 456 P3d 681 (2019) (concluding that DHS had not made reasonable efforts where a delay in services to mother did not afford her an opportunity to become a fit parent). "It is always the burden of DHS to prove by a preponderance of the evidence that its efforts to assist a parent in ameliorating the jurisdictional basis were reasonable." *Dept. of Human Services v. D. M. R.*, 301 Or App 436, 443, 455 P3d 599 (2019).

Also bearing on the reasonable-efforts inquiry is the recognition that reunification of a child with a parent is not limited to physical reunification; it "means the restoration of the parent's right to make the decisions about the child's care, custody, and control without state supervision, even if the child will not be returned to the parent's physical custody because of other impediments, such as incarceration." *L. L. S.*, 290 Or App at 138. Consistent with that view, we "have long recognized that the fact that a parent may not be able to be physically reunited with a child because of incarceration or similar impediments does not excuse DHS from making reasonable efforts to reunify the parent and child." *Id.* at 138-39. "As we have recognized, one way that an incarcerated parent may be able to ameliorate the risk of harm posed to a child by the parent's incarceration— typically, that risk appears to be that no one is available to care for the child—is by enlisting the assistance of others." *Id.* at 139 (citing *Dept. of Human Services v. T. L.*, 279 Or App 673, 685-86, 379 P3d 741 (2016)).

Under those legal standards, here, the juvenile court erred in concluding that DHS had made reasonable efforts to reunify S and father, because DHS has not made efforts that afforded father a reasonable opportunity to enlist the help of his sister to care for S, which he had sought to do since early in the case. In fact, the record reveals that DHS knowingly did not make efforts for reunification through

those means for most of the life of this case, including not allowing contact between S and Collins, because of its opposition to allowing an out-of-state placement unless S's plan was no longer reunification. By the time that DHS agreed that the out-of-state placement with Collins might be appropriate and began to move forward with the ICPC paperwork and authorized contact between S and Collins, it was only a few weeks prior to the permanency hearing, which did not afford father a reasonable opportunity to effectuate that alternative placement.

In so holding, we do not mean to suggest that DHS was required to immediately pursue an out-of-state placement for S while mother was located in state and a potential resource for S. However, here, mother had no contact with DHS or S starting in June 2018, two months before Collins contacted DHS to be considered as a custodial resource. Under those circumstances, DHS did not demonstrate that its efforts were reasonable by categorically refusing, even at the time of the hearing in June 2019, to consider father's plan to place S with Collins while the case plan was reunification. At a minimum, once father proposed a potentially appropriate out-of-state placement to ameliorate the risk of harm to S from the jurisdictional basis (which, here, was solely that father's incarceration made him unavailable to take physical custody of S), reasonable efforts on the part of DHS required affording father a reasonable opportunity— that is, allow a reasonable amount of time—to enlist Collins' help. *L. L. S.*, 290 Or App at 141. DHS has not demonstrated that it was reasonable to only consider Collins as a placement resource if the plan was changed away from reunification.

In addition, we address some of the reasoning employed by the juvenile court and repeated by DHS on appeal, suggesting that DHS's efforts should be viewed through the lens of the difficulties and delays caused in this case by the federal prison where father is incarcerated and by father's "inappropriate" language to Denney or S's foster parents. As to the latter, although in assessing reasonable efforts, the juvenile court can consider a parent's "willingness and ability to participate in services," the reasonable-efforts inquiry is focused on DHS's conduct and the conduct of a parent "does not categorically excuse DHS

from making meaningful efforts toward that parent." *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 306, 388 P3d 1204 (2017). In this case, father was cooperative with DHS in finding an appropriate placement for S and expressed his desire to establish a bond with S, which, given her age, required in-person visits. His conduct in using "inappropriate" language at times in the beginning of his case had no bearing on whether DHS had met its burden to make reasonable efforts.

With regard to the federal prison, we do not discount the difficulties encountered by DHS in that regard. However, those difficulties are not unique to this case or to the federal prison in which father is incarcerated. The incarcerated parent is not charged with the burden of finding solutions to institutional barriers; rather, ORS 419B.476 (2)(a) requires DHS to make reasonable efforts to reunify children with their parents, even incarcerated parents. That obligation includes allowing enough time to give parents a reasonable opportunity to use those efforts to ameliorate the risk of harm to their child caused by the jurisdictional bases. Delays caused by the institutional barriers of prison do not categorically excuse DHS from making reasonable efforts before seeking to change a child's plan away from reunification. *See, e.g.*, *D. M. R.*, 301 Or App at 444-45 ("DHS is not excused from making reasonable efforts to assist a parent because a caseworker believes that efforts are futile."). Here, DHS did not meet its burden to prove that it had made reasonable efforts for reunification of S with father by the time of the permanency hearing and that failure is not excused by delays and communication difficulties caused by the federal prison.

Because DHS did not prove that it made reasonable efforts with respect to father to satisfy its obligation under ORS 419B.476(2)(a), the juvenile court erred in changing S's plan away from reunification. Accordingly, we reverse and remand.

Reversed and remanded.