218                    June 3, 2026                    No. 480

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of S. B. B.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*and*

S. B. B.,
*Respondent,*

*v.*

T. B.,
*Appellant.*

Crook County Circuit Court
24JU00749; A188128

Wade L. Whiting, Judge.

Argued and submitted April 22, 2026.

Kyle Sessions Vazquez, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

E. Nani Apo, Assistant Attorney General, argued the cause for respondent Department of Human Services. Also on the brief were Dan Rayfield, Attorney General, and Paul L. Smith, Solicitor General.

Erica Hayne Friedman argued the cause for respondent child. Also on the brief was Youth, Rights & Justice.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Father appeals from a permanency judgment that changed his child's plan from reunification to adoption.[1] On appeal, he argues that the Oregon Department of Human Services (ODHS) did not meet its burden to show that it made reasonable efforts to reunify father and his child, because ODHS caused delay in establishing his paternity and did not make reasonable efforts during the periods that he was in jail. We conclude that the juvenile court did not err in determining that ODHS made reasonable efforts and affirm.

Father does not ask us to take *de novo* review, and we decline to do so. ORAP 5.40(8). We review the juvenile court's determination that ODHS made reasonable efforts for errors of law. *Dept. of Human Services v. L. L. S.*, 290 Or App 132, 133, 413 P3d 1005 (2018). "In conducting that review, we are bound by the juvenile court's explicit factual findings if there is evidence to support those findings." *Id*. We also "presume that the court made any necessary implicit factual findings in a manner consistent with its ultimate legal conclusion." *Id*. We summarize the facts most important to our analysis in accordance with that standard.

Father's child, S, was 15 months old at the time of the permanency hearing. ODHS became involved shortly after S's birth in February 2024, when the hospital reported that S was born drug affected and that the relationship between mother and father was characterized by violence. During an argument in the early morning hours of February 8, while they were still at the hospital, father accused mother of cheating and questioned whether he was S's biological father. Father left the hospital with security. On February 8, ODHS removed S from parents' care and placed her with mother's grandmother, where S has remained.

At that time, father "went back and forth" on whether he was S's biological father, claiming both that he was and was not her father. ODHS treated father as S's father throughout the case and mother never indicated that anyone else could be S's father. ODHS filed its petition to

---

[1] Mother is not a party to this appeal.

establish wardship of S three days after her birth and listed father as S's "father."

At first, father was "sporadically engaged" with ODHS. He visited S once but left early, stating that "there isn't a lot to do with a newborn." Father was "unable or unwilling" to set up a time for supervised visits with S. Then, on March 16, father and mother had a physical altercation, resulting in father's arrest. Father remained in Crook County jail until April 4, when he pleaded no contest to strangulation of mother. The criminal court sentenced him to 24 months of probation, including 20 days in jail, with credit for time served. The criminal court ordered father to complete a substance abuse evaluation and treatment, complete a batterer's intervention treatment program, refrain from using drugs, submit to random drug testing, and refrain from contacting or attempting to contact mother.

On March 25, ODHS referred father for services for alcohol and drug support, a mental health assessment, and parenting classes and mentoring. Father signed an action agreement with ODHS on April 10, but he did not engage with any services.

On April 15, the juvenile court held the jurisdictional trial for S. The jurisdictional judgment lists father as the "putative father." The court found that three of the jurisdictional allegations pertaining to father were established based on his admissions: "father's substance abuse impairs his ability to safely parent the child, placing the child at risk of harm"; "child's father has a pattern of uncontrolled, volatile, and aggressive behavior that escalates into offensive physical contact with the child's mother, placing the child at risk of harm"; and "father's residential instability interferes with his ability to safely parent the child, placing the child at risk of harm." Father did not challenge his paternity.

Later in April, father tested positive for methamphetamine and THC. In May, father completed the criminal-court-ordered assessment for batterer's treatment and was approved to enter the program, pending a clean drug test. However, on June 3, father tested positive for methamphetamine from a test taken on May 29. On June 12,

father tested presumptively positive for methamphetamine and was arrested for that probation violation. The criminal court sanctioned him to 20 days in the Crook County jail, and he was released on June 28.

In July, ODHS reported that father had one visit with S since his first visit that happened before the jurisdictional hearing. It went well, but father asked to stop visits because his schedule was overwhelming and the "visits would set him up for failure." As of July, father also denied substance use or mental health problems and declined to participate in any services.

On July 21, father was arrested for a probation violation for contacting mother, and the court sanctioned father to 30 days in jail. He was released on August 19, and, on August 27, father was arrested during a domestic violence incident with mother and charged with fourth-degree assault. Father was ultimately acquitted of the assault charge on November 5, but he had remained in custody for the 70 days while that charge was pending.

In early November, father completed the criminal-court-ordered substance abuse assessment. However, on November 13, father admitted to his probation officer that he used methamphetamine the week prior and that he contacted mother, beginning on the day he was released from jail. On November 21, the criminal court revoked father's probation and sentenced him to 160 days in jail, with credit from August 6, and 24 months of post-prison supervision. Father was released on January 24, 2025. On January 27, father admitted to his probation officer that he contacted mother in person, and he was arrested for violation of the no-contact order. Father was released from jail for that violation on March 27.

Sometime during his incarceration in the fall, father told the family's ODHS caseworker, Salaz, that he did not want to restart visits with S until he had DNA testing to confirm paternity. Salaz asked father why he was questioning paternity and father "said he didn't know and he was certain he was the father but still wanted the paternity done." Salaz put in a referral to get the DNA testing done, but she could not locate father when he was out of jail, and

when he was in jail a court order was needed to get the testing. In December, while father was in jail, ODHS obtained the court order and collected DNA from father for the testing. In February 2025, while father was again in jail, the Child Support Division completed the DNA testing, which confirmed father's paternity of S.

After his release from jail in March, and after receiving paternity confirmation, father asked for visits with S. He also completed a mental health assessment and began substance use disorder treatment and a parenting class. Father testified that he needed 90 to 120 days to complete substance use treatment and nine months for batterer's intervention. He also had not yet started mental health treatment. Salaz testified that father needed several months to make sufficient progress. Father also obtained employment. He claimed that the DNA confirmation had motivated him to engage in services and that before that he "really wasn't trying." He visited S six times between April and the start of the permanency hearing on May 13. At the time of the hearing, father was staying in a shelter where children were not permitted.

Salaz testified that after father's recent release, he was willing to meet with her and engage. Previously, father would meet with Salaz in the jail and they would make a plan for meeting on his release, but father would not meet with her outside of jail. Each time Salaz learned that father was in jail again, she would contact him. During those visits, Salaz would update father about S, show him pictures of S and go over the importance of meeting when he was released. Salaz also contacted father's probation officer and learned that Crook County jail did not provide any services. At the time of the hearing, ODHS listed the efforts for father as including contact with father, funding to obtain an identification, approval of a supervisor for visitation with S in the resource parent's home, visitation at ODHS, gas vouchers for visits, and referrals for mental health treatment, substance use evaluation, treatment, and support, and parenting classes and mentoring.

The juvenile court held the permanency hearing over two days—May 13 and 23, 2025. At the second hearing,

ODHS presented evidence that, since the first hearing date, the police had arrested father for driving under the influence of a controlled substance and possession of methamphetamine, and he was again in jail. Salaz testified that virtual visits with S could be set up and that ODHS could purchase parenting books for father to read in jail.

At the close of the hearing, as relevant here, father argued that ODHS failed to make reasonable efforts because it had delayed getting paternity testing done and had failed to facilitate services for him while he was incarcerated.

The juvenile court determined, based on the totality of the evidence, that ODHS had made reasonable efforts and that father had failed to make sufficient progress to allow S to safely return home, and changed S's plan from reunification to adoption.

On appeal, father's sole argument is that ODHS did not prove that its efforts to reunify father and S were reasonable. Under ORS 419B.476(2)(a), in order to change a child's permanency plan from reunification to adoption, the juvenile court must, among other things, determine whether ODHS made "reasonable efforts" to reunify the parent and child.[2] *L. L. S.*, 290 Or App at 138. Reasonable efforts are "efforts that focus on ameliorating the adjudicated bases for jurisdiction, and that give parents a reasonable opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents." *Id.* (internal quotation marks omitted). "The reasonableness of [O]DHS's efforts depends upon the particular circumstances of each case." *Dept. of Human Services v. S. M. H.*, 283 Or App 295, 305, 388 P3d 1204 (2017) (internal quotation marks omitted). ODHS has the burden to prove reasonable efforts by a preponderance of the evidence. *Id.*

---

[2] ORS 419B.476(2)(a) provides:

"At a permanency hearing the court shall:

"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts or, if the ward is an Indian child, active efforts as described in ORS 419B.645 to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

On appeal, father argues that ODHS failed to make reasonable efforts because it failed to confirm his paternity for a full year after S's removal and failed to facilitate services for father during the times he was in Crook County jail. Father argues that not having paternity established was a barrier to his participation in services and that establishing paternity was needed because ODHS could not have reunified S with a "putative" father. Father also asserts that ODHS did not make reasonable efforts for father while he was in jail, having done nothing after learning that the jail did not offer services. We conclude, based on the totality of the circumstances, that ODHS did prove reasonable efforts by a preponderance of the evidence.

We first address the issue of paternity. We conclude, viewing the record as a whole, that ODHS's efforts were reasonable with respect to establishing father's paternity. Here, ODHS treated him as S's father from the start of the case and put on evidence that father was not treated differently with respect to offered services or visitation with S. Father admitted allegations in the jurisdictional petition that included that he was S's father, and he did not request a DNA test until the fall of 2024. Even then, he acknowledged to Salaz that he was "certain" he was S's father. Other than not wanting to restart visits with S until after the testing, father did not indicate to ODHS that establishing paternity was a barrier to him engaging in any services. Once father requested the testing, ODHS made efforts to complete it. On this record, the juvenile court could conclude that ODHS had no reason to believe that not having a paternity test was a barrier to father's participation in services or that obtaining a test earlier would improve father's engagement, given his repeated probation violations and his arrest for driving under the influence and possession that occurred between the two permanency hearing dates.[3] *See, e.g.*, *Dept. of Human Services v. M. K.*, 257 Or App 409, 416, 306 P3d 763 (2013) (stating that "[s]everal of our cases highlight the importance of considering whether a parent is likely to benefit from a service").

---

[3] We reject without extended discussion father's assertion that, until ODHS confirmed paternity, he was a "legal stranger" to S. Under ORS 419B.875(1)(a)(C), father was a party to the proceeding as the "alleged genetic parent" of S.

We next address father's incarceration. Our case law has long established that ODHS "is not excused from making reasonable efforts toward reunification simply because a parent is incarcerated." *S. M. H.*, 283 Or App at 306. In assessing ODHS's efforts, "a juvenile court properly considers 'the length and circumstances of a parent's incarceration,' *Dept. of Human Services v. S. W.*, 267 Or App 277, 293-94, 340 P3d 675 (2014), and 'evidence specifically tied to [a parent's] willingness and ability to participate in services,' *see Dept. of Human Services v. J. M.*, 275 Or App 429, 449, 364 P3d 705 (2015), *rev den*, 358 Or 833 (2016)." *Id.* (brackets in original).

Here, ODHS began offering father services before the jurisdictional hearing on April 15, but he visited S only once and "sporadically engaged" with ODHS. His first incarceration was for 20 days, ending on April 4. Father did not engage with ODHS or any services following that incarceration, other than to visit S once, before his next term of incarceration starting on June 12. Between June 2024 and March 2025, father was in and out of jail for probation violations, due to his drug use and contacting mother. Those periods of jail time were sporadic and ranged from 20 days to just over two months. When father was out of jail, ODHS had difficulty locating him, despite arranging meetings with father before he was released, and father would not engage in services. Each time father was in jail, Salaz would reinitiate contact with father, would meet with him at the jail, update him on S, and try to plan with him for meeting and for services on his release. Given the circumstances, ODHS's failure to facilitate services to father while he was in jail was not unreasonable.

This case is readily distinguishable from *Dept. of Human Services v. M. C. C.*, 303 Or App 372, 463 P3d 592 (2020), a case relied on by father. In that case, the father was incarcerated for the life of the case on serious charges in federal prison. He engaged with services offered in prison, maintained contact with ODHS, and tried to arrange for his sister as a placement for the child. ODHS did not allow contact between the child and the father's sister and opposed an out-of-state placement so the child could remain close

to the mother, even though the mother had no contact with ODHS or the child. We concluded that ODHS had not made reasonable efforts because it had "not made efforts that afforded father a reasonable opportunity to enlist the help of his sister to care for [the child], which he had sought to do since early in the case." *Id*. at 381. We emphasized that, in that case, the father "was cooperative with [O]DHS in finding an appropriate placement for [the child] and expressed his desire to bond with [the child]." *Id*. at 383.

In contrast, here, father's terms of incarceration were short, and each time father was out of jail he would not engage with ODHS or any services. In July, father was denying any substance use or mental health problems and was declining visits with S. During his fall incarceration, father declined to restart any visits with S. It was not until March 2025 that father engaged with ODHS. This is not a case where ODHS's failure to facilitate any services for the parent in jail was the main barrier to father making progress on ameliorating the bases for jurisdiction, nor is it a case where ODHS failed to maintain contact with the parent while incarcerated or failed to inquire about whether services could be provided in jail. *See Dept. of Human Services v. A. R. S.*, 343 Or App 260, 266, 577 P3d 1228 (2025) ("It is a case where the county jail where father was housed would not allow the specific service to be provided at the jail—and ODHS is not required to do the impossible."). Here, there was sufficient evidence from which the juvenile court could conclude that father would not have benefited from additional efforts during his short periods of incarceration and that, on the whole, ODHS's efforts were reasonable.

Affirmed.